[Civ. No. 53178. First Dist., Div. Five. Oct. 24, 1983.]

COTATI ALLIANCE FOR BETTER HOUSING et al.,
Plaintiffs and Respondents, v.
CITY OF COTATI et al., Defendants and Appellants.

COUNSEL

Myron Moskovitz and Jeffrey A. Walter for Defendants and Appellants.

Robert M. Myers, City Attorney (Santa Monica), Stephen S. Stark, Assistant City Attorney, Karl M. Manheim, Deputy City Attorney, Michael Heumann and Stephen P. Wiman as Amici Curiae on behalf of Defendants and Appellants.

Burch Fitzpatrick and Miller, Starr & Regalia for Plaintiffs and Respondents.

Stacey & Jones, Stephen L. Jones, George Kimball, Latham & Watkins, Joseph R. Austin, William C. Schweinfurth, David B. Babbe and Tuttle & Taylor as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**KING, J.**—In this case we are asked to define the constitutional limits of economic regulation in the field of rental housing. We hold that a local rent control ordinance which requires that landlords receive a fair and reasonable return on their investment is constitutionally valid on its face as a form of economic regulation reasonably related to the furtherance of a legitimate governmental purpose. Further, we hold that provisions of the ordinance fixing the maximum rent which can be charged are reasonably calculated to eliminate excessive rents and, at the same time, provide landlords with a just and reasonable return on their property as that terminology was utilized by the California Supreme Court in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001]. On its face the ordinance is not unconstitutionally confiscatory since it does not have a necessary effect of lowering rents more than could be reasonably considered to be required for its stated purpose.

On November 13, 1979, the City Council of the City of Cotati approved and adopted an ordinance entitled "Cotati Rent Stabilization Ordinance." Cotati Alliance for Better Housing (landlords), a group of Cotati landlords, filed a complaint for injunctive and declaratory relief against the City of Cotati, the Cotati City Council and the Cotati Rent Appeals Board (Cotati) challenging the validity of the ordinance. The complaint alleged that the ordinance was invalid on its face because it used an investment-based stan-

dard for determining rent adjustments. Landlords obtained a judgment on the pleadings, the trial court ruling that the ordinance was unconstitutional because due process guarantees require a value-based standard for determining rent adjustments. The trial court enjoined enforcement of the ordinance. Cotati appeals and, for the reasons stated, we reverse the judgment.[1]

The ordinance in question is a comprehensive rent control ordinance which creates a Rent Appeals Board (Board), requires that landlords register each rental unit and pay an annual registration fee to the Board, establishes base rent ceilings, provides for annual general adjustments and individual adjustments of rent ceilings, prohibits evictions except for specified reasons, and prescribes remedies for violations of its provisions. We emphasize that the only issue before this court is the facial validity of those provisions of the ordinance providing for annual general adjustments and for individual adjustments of rent ceilings, and we limit our decision to those issues. Although other provisions of the ordinance appear to raise constitutional issues, they were not challenged by the parties and are not properly before the court in this appeal.

Section 4 of the ordinance sets forth the procedures for establishing a base rent ceiling. Section 5[2] provides for general rent adjustments and section 6[3] for individual adjustments of the ceiling on allowable rents.

---

[1]Landlords also challenged the provisions of the ordinance imposing a registration fee on landlords, but the trial court rejected this challenge and landlords have taken no appeal from this portion of the judgment.

[2]Section 5, subdivision (b), provides in full:

"b. *Annual hearing on general adjustments and maximum ceiling.* No more than once annually, after proper notice, the Board shall conduct hearings for the purpose of determining annual maximum rent adjustment. In making general maximum rent adjustments and imposing annual maximum rent ceilings, the Board shall consider all relevant cost factors affecting rent controlled units including but not limited to the following:

"(1) Increases or decreases in property taxes;

"(2) Unavoidable increases or decreases in operating and maintenance expenses;

"(3) Capital improvement of the controlled rental unit as distinguished from normal repair, replacement and maintenance;

"(4) Increases or decreases in living space, furniture, furnishings, or equipment;

"(5) Substantial deterioration of the controlled rental unit other than as a result of ordinary wear and tear;

"(6) Failure on the part of the landlord to provide adequate housing services or to comply substantially with the Cotati Housing Code and other applicable state and local statutes; and

"(7) The landlord's rate of return on investment."

[3]Section 6 provides in full: "Section 6. *Individual Adjustment of Ceiling on Allowable Rents.* No later than thirty (30) days after the maximum rent in a rent controlled unit has been considered by the board and has been increased or decreased in accordance with the provisions of Section 5, any landlord or tenant can appeal for an individual adjustment of the maximum allowable rent. In considering petitions for individual maximum rent adjustment petitions, the board and its staff shall consider all of those factors, in order to guarantee landlords a fair and reasonable return on their investment. However, if the only justification

Section 5 of the ordinance mandates that the Board in determining annual adjustments "shall consider all relevant cost factors affecting rent control units including but not limited to" seven enumerated factors, one of which is "The landlord's rate of return on investment." Section 6 provides that the Board in determining individual rent adjustments "shall consider all of those factors, in order to guarantee landlords a fair and reasonable return on their investment." Clearly, "those factors" as stated in section 6 refers to all relevant cost factors, both listed and unlisted, as mentioned in section 5.

In *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, the California Supreme Court held that rent control is a proper exercise of local government's police power if it is "reasonably calculated to eliminate excessive rents and at the same time provide landlords with a *just and reasonable return on their property.* However, if it is apparent from the face of the provisions that their effect will necessarily be to lower rents more than could reasonably be considered to be required for the measure's stated purpose, they are unconstitutionally confiscatory." (17 Cal.3d at p. 165 (italics added).)[4] The *Birkenfeld* court did not discuss appropriate standards for determining what constitutes a just and reasonable return on "property." Landlords contend the phrase means "exactly what it says" and that the trial court properly ruled the Cotati ordinance is unconstitutionally confiscatory (i.e., denies due process) because it does not require a return to the landlord based upon the present fair market value of property, i.e., a "return on value" standard.[5] Cotati contended at oral argument that its ordinance was constitutional even if interpreted as restricting the landlord's return to a return on historical investment. However, after oral argument we vacated submission of the case to receive a concession by Cotati that the term "fair and reasonable return on their investment" may reason-

---

offered for the requested rent increase on the landlord's application is an assertion that the maximum rents or maximum adjusted rents permitted pursuant to this Section do not allow the landlord return sufficient to pay both the operating expenses and debt service on the rental unit or units or on the housing complex containing the rental unit or units or on the housing complex containing the rental unit, a rent adjustment will not be permitted pursuant to this subsection to a landlord who acquired an interest in the rental unit or units after December 1, 1978."

[4]The court in *Birkenfeld* held, *inter alia,* that the Berkeley rent control ordinance being considered by the court exceeded the constitutional limits of the police power by prescribing a rent adjustment procedure that would have made unreasonable delays inevitable. (17 Cal.3d at pp. 165-174.)

[5]Cotati claims that this issue is not properly before this court because landlords have not alleged that they actually have been unable to realize fair returns and have not exhausted their administrative remedies. But the decision in *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at page 165, establishes that courts may review the facial validity of a rent control ordinance for possible confiscatory effects before the ordinance has been allowed to become operative and actual rent ceilings imposed.

ably be interpreted to permit the Board to consider and allow for any decrease in the purchasing power of the dollar due to inflation.

█ The facial validity of sections 5 and 6 of the ordinance, the only issue before us in this appeal, must be determined by answering whether "a fair and reasonable return on their investment," i.e., a "return on investment" standard, meets the *Birkenfeld* mandate that landlords be afforded a "just and reasonable return on property."

Landlords argue that the Supreme Court in *Birkenfeld* cited decisions demonstrating its apparent awareness that other jurisdictions have approved the return on investment standard, yet did not mention that standard, thus implicitly rejecting it. But the Supreme Court chose to cite *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543, 565-671 [350 A.2d 1, 13-16] for the proposition that rent control provisions must assure a just and reasonable return on "property." (17 Cal.3d at p. 165.) The court in *Hutton* applied to the rent control field the general rule that "price controls which do not permit an economically efficient operator to obtain a 'just and reasonable' return on his *investment* are deemed confiscatory." (350 A.2d at p. 14 (italics added).) Further, the *Birkenfeld* court chose not to cite *Troy Hills Village* v. *Township Council* (1975) 68 N.J. 604 [350 A.2d 34, 43], decided by the New Jersey Supreme Court on the same day that it decided *Hutton*; the *Troy Hills* decision stated that *value*-based factors must be considered in determining whether a rate of return is just and reasonable. (The New Jersey court subsequently repudiated the return on value approach in *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65].) If anything is to be concluded from the selective citation in *Birkenfeld*, it is that our Supreme Court approved the application of the investment-based standard in *Hutton* but not the use of value-based criteria as mandated in *Troy Hills*.

Complications will undoubtedly arise in the application of a return on investment standard. The extent of a landlord's "investment" may not be readily apparent. For example, the landlord may have obtained the property by gift or inheritance, purchased it with no down payment, converted investment into debt through refinancing or improved the property years ago with preinflation dollars. (See Note, *Rethinking Rent Control: An Analysis of "Fair Return"* (1981) 12 Rutgers L.J. 617, 647-648.) Landlords contend that these complications demonstrate the confiscatory effect of the investment standard, which unfairly restricts landlords to a return on their "initial cash investment."

The ordinance is not, however, drawn as restrictively as landlords suggest. Nowhere in the ordinance do the terms "initial" or "cash" modify

the word "investment." The ordinance does not exclude forms of investment such as mortgage payments toward principal, cash invested in later improvements in the property, a landlord's labor in making building improvements, and other possible contributions to the premises which could be considered as investments in the property. (See *World Wide Realty* v. *Boston Rent Control Adm'r* (1979) 7 Mass.App. 327 [387 N.E.2d 598, 601] ["While the term 'investment' has not been defined, a return on investment need not mean a return on purchase price . . . ."].) The ordinance does not define "investment," nor need it do so. It is invalid on its face only if "its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties." (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165.)

We reject landlords' contention that a "return on value" standard is mandated in order for a rent control ordinance to pass constitutional muster. The fatal flaw in the return on value standard is that income property most commonly is valued through capitalization of its income. Thus, the process of making individual rent adjustments on the basis of a return on value standard is meaningless because it is inevitably circular: value is determined by rental income, the amount of which is in turn set according to value. Use of a return on value standard would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as those which would be charged in the absence of regulation. Value (and hence rents) would increase in a never-ending spiral. Similarly, as apparently was true in Cotati, if there was a housing shortage which caused rents to be artificially high, use of prerent control value as the measure will perpetuate artificially inflated rents. Rent control utilizing this standard is no rent control at all.

For these reasons courts that have considered the problem have uniformly rejected the return on value standard. (E.g., *Helmsley* v. *Borough of Fort Lee, supra,* 394 A.2d at p. 71 ["Once income is controlled, however, using capitalization of income to determine value to regulate future income is a circular process."];[6] *Niles* v. *Boston Rent Control Administrator* (1978) 6 Mass.App. 135 [374 N.E.2d 296, 301] ["Where rents are based on the fair market value of property which in turn is determined by the rents received on the property, the process is circular."]; see also *Wilson* v. *Brown* (E.C.A. 1943) 137 F.2d 348, 353.) The most recent judicial rejection of a return on value standard has occurred in California, in *Palos Verdes Shores*

---

[6]Landlords argue that the rejection of value standards in *Helmsley* v. *Borough of Fort Lee* was a dictum, but such rejection was recently reasserted in *Mahoney* v. *Hoboken Rent Leveling Bd.* (1981) 178 N.J. Super. 51 [427 A.2d 1138, 1140].)

*Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362 [190 Cal.Rptr. 866]. There the court rejected the landlord's contention that the "return on property" standard prescribed in *Birkenfeld* mandates a return on "present fair value," citing *Helmsley* v. *Borough of Fort Lee* and *Wilson* v. *Brown.* (142 Cal.App.3d at pp. 370-371.)[7]

The propriety of assuring landlords a fair return on investment, in contrast, has been approved by every published decision that has considered the point. Return on investment has been characterized as the "governing standard" in Massachusetts (*Zussman* v. *Rent Control Bd. of Brookline* (1976) 371 Mass. 632 [359 N.E.2d 29, 32]; *Marshal House, Inc.* v. *Rent Control Bd. of Brookline* (1971) 358 Mass. 686 [266 N.E.2d 876, 888]; *World Wide Realty* v. *Boston Rent Control Adm'r, supra,* 387 N.E.2d at p. 601),[8] and has been asserted by courts in Washington and New Jersey. (*Jeffery* v. *McCullough* (1982) 97 Wash.2d 893 [652 P.2d 9, 13]; *Mead* v. *Borough of Fort Lee* (1979) 170 N.J.Super. 167 [406 A.2d 177].) One authority describes as "typical" the use of return on investment standards for individual adjustments of rent ceilings. (Schoshinski, American Law of Landlord and Tenant (1980) § 7.8, p. 519.) The New Jersey Supreme Court stated in *Helmsley* v. *Borough of Fort Lee* that "In view of the lack of evidence concerning plaintiffs' investment, we offer no comments on investment-based criteria for determining confiscation. Our silence does not, however, denote disapproval. Other jurisdictions have employed such criteria. [Citation.] Although an investment-based standard may not be as easy to apply as some income-based criteria, there are no obvious theoretical obstacles to using an investment-based standard." (394 A.2d at p. 72 fn. 8.)

A recent California decision also approved a return on investment standard, but on the theory that it is susceptible to interpretation as assuring a return on value, which the court asserted was required by due process. (*Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 85-86 [191 Cal.Rptr. 47].) We disagree with this decision in two respects. First, the assertion that due process requires a return on value ignores the unavoidable circularity problem inherent in the assurance of such a return.

---

[7]The court in *Palos Verdes Shores* did not consider the facial validity of a return on investment standard, but of a "just and reasonable return" standard.

[8]The court in *Marshal House* held that a Massachusetts rent control statute, which employed a "fair net operating income" (FNOI) standard, properly required "that rents be set so as to assure to landlords a reasonable return on their investment." (266 N.E.2d at p. 888.) FNOI methods assure a given amount of net operating income (the excess of annual rental income over annual operating expenses). (*Id.,* at p. 887; see Note, *Rethinking Rent Control: An Analysis of "Fair Return"* (1981) 12 Rutgers L.J. 617, 647-648.)

Indeed, the single decision cited by *Gregory* (*id.*, at p. 85) as direct support for this assertion, *Helmsley* v. *Borough of Fort Lee,* actually *rejected* a value-based standard because of the circularity problem. Second, we believe the court's conclusion that investment and value are synonymous is based on a faulty premise. The court reasoned, "In a broad but very real sense the value of an owner's property is his 'investment.' The owner could, at any given moment, sell the [mobile home] park at its fair market value." (142 Cal.App.3d at p. 86.) But the value of an owner's property is *not* equivalent to investment where the property is mortgaged. The owner may be able to sell at fair market value, but the proceeds from the sale will be reduced by expenses of sale and the amounts of any security interests in the property. Thus, the assurance of a return on value may well yield more than a return on the owner's investment.[9]

As previously noted, a return on investment standard does create some difficulties where the landlord has not actually made any investment, for example, where he or she has inherited the property. However, the unqualified and undefined return on investment standard of the ordinance we are reviewing affords sufficient flexibility to the Board to permit avoidance of confiscatory results in the ordinance's application. Because "return on their investment" is not limited to initial or cash investment, a landlord's personal labor in improving property may be considered an investment meriting a fair rate of return. The landlord who purchased property years ago with preinflation dollars is not limited to a return on the actual dollars invested; the Board may equate the original investment with current dollar values and assure a fair return accordingly.

The gift or inheritance situation is more problematic, given the absence of any investment by the recipient, but confiscatory results are still avoidable. The ordinance guarantees simply "a fair and reasonable return on their "investment." This need not be interpreted as being restricted to an investment personally made by the landlord. The ordinance does not preclude the Board from devising methods of imputing an investment to landlords who obtained property by gift or inheritance (e.g., use of the transferor's investment, adjusted to reflect the value of preinflation dollars or other pertinent factors).[10]

Complications resulting from differing financing terms are similarly surmountable. Differences in financing may affect a landlord's return on in-

---

[9]The California Supreme Court declined to grant hearings in both *Gregory* and *Palos Verdes Shores, supra.*

[10]Because landlords have chosen to limit the present litigation to an attack on the facial validity of the ordinance the adequacy of measures actually taken by the Board to deal with gift and inheritance problems is not now before this court.

vestment. Section 6 provides, "In considering petitions for individual maximum rent adjustment petitions, the board and its staff shall consider all of those [relevant] factors, in order to guarantee landlords a fair and reasonable return on their investment." Nothing in the ordinance precludes the Board from considering individual financing terms or mortgage payments to principal in determining what constitutes a fair return. The ordinance includes no detailed scheme for dealing with financing problems, but such detail is not required. A rent control ordinance need not even expressly assure a fair return at all; if there is no such provision one will be implied. (*Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d at p. 16.)

As a practical matter, moreover, the difficulties contemplated by landlords will constitute the exception rather than the rule, because of the way in which the ordinance works. General annual adjustments, although made with consideration of all major cost factors including "The landlord's rate of return on investment," are not individually devised to guarantee each landlord a fair and reasonable return on investment but are granted across the board. Only those landlords who desire a higher rent will seek an individual adjustment pursuant to the provisions of section 6 of the ordinance, which override all other provisions and "guarantee landlords a fair and reasonable return on their investment." As it is to be presumed that the Board will not act in an arbitrary or capricious manner in setting general adjustments (see *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838]), there should be relatively few instances in which an annual adjustment will not assure the required fair return once the ordinance is fully operative.

■ Landlords argue that the investment-based standard of the ordinance unfairly deprives Cotati landlords of any long-term appreciation in the value of their property. Some lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income. (See *Helmsley* v. *Borough of Fort Lee, supra,* 394 A.2d at p. 72 [rent control "limits the potential growth of . . . income stream (and also therefore the potential capital appreciation on resale)."].) It is one of the very sources of long-term appreciation—inflated rents—that rent control measures are intended to restrict.[11] Landlords also argue that the ordinance unfairly denies long-time landlords any appreciation from the time of acquisition to the date when rents were first controlled,

---

[11]Also, because rent control may very well depress potential rental income and therefore artificially lower what would otherwise be the fair market value of property in an unregulated market, once rent control has been imposed a return on value may no longer be reliable in determining what the owner should receive.

but the ordinance did not *reduce* rents when it was enacted, and thus, did not affect preordinance appreciation.

Facial validity, in short, is concerned more with excessive restriction than with comprehensiveness of regulation. "Undoubtedly, rent control ordinances can be written which are so restrictive as to facially preclude any possibility of a just and reasonable return . . . . It is only these or comparably drastic ordinances which can be struck down as facially confiscatory." (*Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d at p. 16.) Cotati's ordinance is not so restrictive. The investment-based standard affords the Board sufficient flexibility to enable it to avoid confiscatory results in the ordinance's application.

Landlords next contend that the return on investment standard denies equal protection through disparate treatment of Cotati landlords, in that it will lead to the imposition of different rent ceilings for identical rental units.[12]

It is not clear that there is any disparate treatment of landlords. Disparity is to be perceived only if rents are viewed as the appropriate measure. If the landlord's "investment" is the measure, no disparate treatment is evident, as the ordinance guarantees each landlord the same "fair and reasonable return." Indeed, to impose the same rental ceiling for identical properties without regard for individual investments would result in disparate returns on investments whenever the landlords' investments in the properties differ. Landlords contend that the investment-based standard will yield disparate returns as between identical properties purchased years apart for widely differing prices, but this contention is based on the faulty premise that the ordinance excludes consideration of preordinance appreciation and preinflation dollar values.[13]

Even if rents are viewed as the proper measure and disparity is perceived, such disparate treatment does not violate equal protection guarantees. Equal protection is not denied simply because an ordinance treats one class of persons differently from another. Where there is no suspect classification, and purely economic interests are involved, a municipality may impose any distinction which bears some "rational relationship" to a legitimate public purpose. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 395 [584 P.2d 512].) Courts consistently defer to legislative determinations as to the desirability

---

[12]Landlords state that tenants are similarly denied equal protection, but landlords lack standing to assert this point.

[13]Moreover, even in an unregulated market disparate rents are often charged for identical rental units (e.g., where a landlord charges less rent to keep a long-term tenant).

of such distinctions. (*New Orleans* v. *Dukes* (1975) 427 U.S. 297, 303 [49 L.Ed.2d 511, 516-517, 96 S.Ct. 2513].) The ordinance will be upheld so long as the issue is " 'at least debatable.' " (*Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [66 L.Ed.2d 659, 669, 101 S.Ct. 715].)

It is "at least debatable" in the present case that the return on investment standard bears a rational relationship to a legitimate public purpose. The investment-based standard, unlike a value-based standard, ensures that inflationary factors will not be built into a rent control ordinance's rent ceiling adjustment mechanism, and thereby ensures the integrity of the entire rent control scheme. This court must defer to the local governmental determination as to the desirability of any consequential disparate treatment of landlords.

Historically, rent control has been imposed for emergency purposes. Such regulation often occurred to maintain the health of the economy by imposing price controls, or because the country, in time of war, funnelled all possible resources to war-related activity, leaving few human or physical resources available for expansion of the private housing market in overcrowded urban areas. In many instances the overcrowding was accentuated because of war-related activities in those areas, and members of the government, including the armed forces and their families, required protection as a matter of emergency need.

In *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129, the California Supreme Court held that the existence of an emergency is not required to permit local government, exercising police powers delegated to it by article XI, section 7, of the California Constitution, to enact rent control. The court noted that the police powers possessed by local government are as broad as those exercised by the Legislature itself, although they are subject to displacement by general state law. *Birkenfeld* further held that such economic regulation was constitutionally valid when reasonably related to the furtherance of a legitimate governmental purpose. (17 Cal.3d at p. 135.) The purpose of rent control laws in general, and as set forth in the Cotati ordinance specifically, is to prevent exploitation of housing shortages by the imposition of excessive rent charges.

In the past 10 years urban areas in California have begun to find essentially all vacant land filled, with little or no vacant space for the installation of additional housing. In many of California's largest cities virtually no empty space exists which is available for additional housing. Given California's continued population growth, it is just a matter of time before remaining vacant space will be exhausted in every major city in California.

Unless and until the Legislature determines this issue to be a proper subject of general state law, local government will be under increasing pressure to adopt rent control as a means of protecting its citizens from excessive rent resulting from increased shortages of residential housing. ■ "It is of the essence of the police power to impose reasonable regulations upon private property rights to serve the larger public good." (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 146.) Prevention of the exploitation of shortages of available housing by precluding excessive rent is a legitimate governmental purpose.

■ On the other hand, inherent in the *Birkenfeld* due process standard of "a just and reasonable return on their property" is the assurance that an efficient landlord may recover all reasonable expenses actually incurred and, in addition, receive a fair profit or return on investment. (*Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d at p. 14.) A failure in this regard might well violate prohibitions against the taking of private property for public use without just compensation contained in the Fifth Amendment to the United States Constitution and article I, section 19, of the California Constitution. An unspoken purpose of rent control during inflationary times is to distribute the burdens of inflation fairly between the landlord and tenant. It should be recognized in inflationary periods that the landlord's investment was made with dollars that were worth more at the time of the investment and therefore may deserve a greater present return. If the net operating profit of a landlord continues to be the identical number of dollars, there is in time a real diminution to the landlord which eventually becomes confiscatory.

The Cotati ordinance does not define "investment" or specify what is "a fair and reasonable return on their investment." ■ "A municipal legislative body is constitutionally prohibited from delegating the formulation of legislative policy but may declare a policy, fix a primary standard, and authorize executive or administrative officers to prescribe subsidiary rules and regulations that implement the policy and standard and to determine the application of the policy or standard to the facts of particular cases." (*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 167.)

As in *Birkenfeld,* "Here the charter amendment's purpose of counteracting the ill effect of 'rapidly rising and exorbitant rents exploiting [the housing] shortage' . . . implies a standard of fixing maximum rent levels at a point that permits the landlord to charge a just and reasonable rent and no more. (*Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d at p. 16.) Indeed [the amendment] directs the Board to 'issue and follow such rules

and regulations, including those which are contained in this Article, *as will further the purposes of this Article.'* (Italics supplied.)

" 'The rule that the statute must provide a yardstick to define the powers of the executive or administrative officer is easy to state but rather hard to apply. Probably the best that can be done is to state that the yardstick must be as definite as the exigencies of the particular problem permit.' *(Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 902 [216 P.2d 882].) By stating its purpose and providing a nonexclusive illustrative list of relevant factors to be considered, the charter amendment provides constitutionally sufficient legislative guidance to the Board for its determination of petitions for adjustments of maximum rents." *(Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 168.)[14]

In considering such relevant factors, the Board must weigh the interests of both the renting public and the landlord. ▋ Rent which meets the minimum standards of being fair and reasonable is that amount which will permit the property to generate income sufficient to cover the costs of operation and the servicing of reasonable financing and to ensure the return of a reasonable profit. A rent control ordinance must not only protect tenants against excessive rents, but also ensure a fair rate of return to landlords. No specific formula can or should be developed since the Board, in making general rent adjustments and acting upon petitions for individual increases, must consider a variety of factors, some of which may be personal or individual to a particular landlord or rental property.

▋ For the reasons set forth above, we find no facial invalidity in sections 5 and 6 of the Cotati ordinance. They meet constitutional standards since they permit the Board to make annual general rent adjustments and, upon an individual's petition, to make individual rent adjustments after considering factors aside from cost increases. Thus, the Board has the ability to consider what level of rent will return a reasonable profit to the landlord considering all relevant factors.

Section 5 of the ordinance contains a nonexclusive list of relevant factors. Other factors that might be considered are:

---

[14]The *Birkenfeld* court also said, "It is true that whether a regulation of prices is reasonable or confiscatory depends ultimately on the result reached. *(Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 602 [88 L.Ed. 333, 344-345, 64 S.Ct. 281].) However, such a regulation may be invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties. *(City of Miami Beach* v. *Forte Towers, Inc.* (Fla. 1974) 305 So.2d 764, 768; see *Mora* v. *Mejias* (1st Cir. 1955) 223 F.2d 814.) It is to the possibility of such facial invalidity that our present inquiry is directed." *(Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 45.)

1. Societal importance of ensuring that real estate remains a viable investment so that the rental housing stock is maintained, improved and replenished.

2. The return appropriate to this type of investment to attract and retain investors. An investment in rental property, which involves risk as well as active management and which usually involves anguish and worry on the part of the investor, should bear a greater rate of return than a passive investment involving no personal management and no risk, e.g., an insured certificate of deposit with a financial institution. The rate of return should be consistent with the risk in the investment, and should be high enough to discourage the flight of capital from the rental housing market and encourage landlords to maintain their buildings and services at appropriate levels. The rate of return should allow the owner to properly maintain the property, that is, to provide good management, to maintain services at an adequate level, and to properly maintain the physical asset itself, and should provide incentive to do so. At the same time, there is no reason why the rate of return to an efficient owner may not be greater than to an inefficient owner.

3. Tax benefits to the landlord, including consideration of comparable tax benefits in other types of investments. For example, the Board might consider the consequences to landlords whose property is fully depreciated.

4. The physical location of the property and the types of tenants. Buildings in different locations may well have different profits and thus, have a different rent structure. Buildings in which tenants remain for lengthy periods may well have a different rental structure than those in which there is a rapid and regular turnover. Additionally, some buildings have types of tenants who create more psychological and management hardship to the owner than others.

5. Particular hardship circumstances of the owner.

6. The effects of the decrease in the purchasing power of the dollar during inflationary periods. A dollar 10 years ago was worth more than a dollar today, and a reasonable rate of return will account for this factor. This may be counterbalanced in part by more favorable financing terms in older mortgages.

While all of the above are factors that may be considered, the extent to which they are considered in setting a fair rent is within the province of local government, not of the courts.[15]

We emphasize that the purpose of rent control is not to make the landlord a private guarantor of affordable housing for tenants, nor is it to bring about such a degree of decreased maintenance and services as to diminish the quality of housing available. The purpose of rent control is to permit an efficient landlord to pay all actual and reasonable expenses and receive a fair profit while, at the same time, protecting the public interest in having affordable and properly maintained rental housing available to the citizens of the community. The Cotati ordinance does not on its face prevent the Rent Appeals Board from meeting this goal.

The judgment is reversed.

Low, P. J., and Haning, J., concurred.

The petitions of all parties for a hearing by the Supreme Court were denied December 28, 1983.

---

[15]Many of the factors discussed above and enumerated in the ordinance are unique to rent control. They are, for example, different than those that might be relevant to the regulation of a public utility which is monopolistic and has government regulation which assures a rate of return on market value while protecting the public interest in the availability of utility services at a reasonable rate.