[No. B015599. Second Dist., Div. Three. May 30, 1986.]

JAMES W. BAKER, Plaintiff and Appellant, v.
CITY OF SANTA MONICA et al., Defendants and Appellants;
SANTA MONICANS FOR RENTERS' RIGHTS et al., Interveners.

JOHN J. STEIN, Plaintiff and Appellant, v.
CITY OF SANTA MONICA et al., Defendants and Appellants;
SANTA MONICANS FOR RENTERS' RIGHTS et al., Interveners.

*

**COUNSEL**

Stephen L. Jones, Latham & Watkins and George Kimball for Plaintiffs and Appellants.

Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Karl M. Manheim and Marsha Jones Moutrie, Deputy City Attorneys, Joel Martin Levy, Hadassa K. Gilbert and Kathleen P. Reilley for Defendants and Appellants.

**OPINION**

**MILLS, J.**[*]—Defendants and appellants City of Santa Monica and the Santa Monica Rent Control Board (Board), and plaintiffs, respondents and cross-appellants John J. Stein and James W. Baker appeal from a judgment upholding Board's standards for determining rent increases, but permanently enjoining defendants and appellants from "regulating or prohibiting, directly or indirectly, demolitions of controlled rental housing."

---

[*]Assigned by the Chairperson of the Judicial Council.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 10, 1979, the City of Santa Monica (City), responding to a housing crisis in which much of its rental stock had been razed, by initiative added a rent control law to its city charter providing basically the following:

—established an elected Rent Control Board (Board),

—instituted a rent rollback and freeze,

—required the Board to establish procedures,

—prohibited evictions, and

—imposed controls on removals and demolitions.

On the very next day James W. Baker (Baker) filed a taxpayer's suit against City, Board and others, challenging the validity of the rent control law and the regulations promulgated pursuant to it and seeking a mandatory injunction and declaratory relief. A later mandamus action brought by John J. Stein (Stein) and raising similar issues was consolidated with it.

Soon after filing the complaint, Baker requested a preliminary injunction to enjoin the rent control law. The motion was denied on July 13, 1979. A preliminary injunction to enjoin the rent rollback provisions was denied on September 5, 1979. A pretrial statement and order was entered on November 18, 1980, in which the following issues were identified for trial: 1. whether the rent control law on its face or as applied satisfies the constitutional standards for "just and reasonable return on property," as required by the California Supreme Court in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001]; 2. whether the Board's administrative procedures afford landlords due process; 3. whether the rent control law impermissibly discriminates among several situated properties, thereby denying landlords equal protection of the laws; 4. whether the rent control unconstitutionally diminishes the value of rental property; and 5. whether the Board may constitutionally regulate the removal of rental units.

The case was eventually set for trial on December 2, 1980, and tried in four phases[1] over a two-and-one-half-year period.

In phase I the trial court considered the validity of regulation 4040 which allowed rent increases based on a landlord's original cash or "historic

---

[1]Each phase was followed by a memorandum of intended decision and findings of fact and conclusions of law (or statement of decision).

investment" in the property and referred to as the "fair return on investment standard". On July 27, 1981, the court signed findings of fact and conclusions of law[2] determining that City's standard was unconstitutional because it did not allow a fair return based on the fair market value of properties.[3]

The trial court honored a request by City to cure any deficiencies in its rent standards and allowed promulgation of new "fair return" standards to be submitted for further hearing. A new regulation (4100) employing a "net operating income" (NOI) approach was promulgated.[4]

In phase II the constitutionality of regulation 4100 was tried and on February 17, 1982, in its announcement of intended decision, the court determined that the new provisions violated neither the California nor the federal Constitutions.

In phase III the constitutionality of the removal aspects (charter § 1803(t)) of the rent control law was tried. The court found the provisions facially invalid under the doctrine of *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana* (1920) 251 U.S. 396, 399 [64 L.Ed. 323, 326, 40 S.Ct. 183] (a regulated utility could not be compelled to continue operation if it could only operate at a loss), ruling that criteria for a removal permit based on impact on the housing stock could not be imposed consistent with that doctrine.

The court again allowed City an opportunity to promulgate a corrective regulation. On August 12, 1982, following an ordinance enabling same,

---

[2] The principal findings and conclusions were:

1. The "fair return on investment" standard denied landlords equal protection (finding 16) without reasonable basis (finding 17; conclusion 8), and produced widespread, confiscatory results (conclusion 7).

2. Rent control halted the appreciation of rental property values (findings 21, 23, 35), resulting in confiscation of that aspect of the market value attributable to appreciation (findings 25, 26).

3. General rent adjustments of 7 percent in 1979 and 6.5 percent in 1980 were insufficient to avoid widespread confiscatory results (finding 32), and the Board was constitutionally required to award rent increases in excess of the Consumer Price Index (finding 34).

4. Landlords were constitutionally entitled to cash returns on their property greater than the returns on public utility stocks (finding 39).

5. Stricter constitutional standards apply to rent control legislation than to zoning ordinances (conclusion 6).

6. Landlords were entitled to a return based on the fair market value of their properties as defined by Code of Civil Procedure section 801.1 et seq. (conclusions 9, 11).

7. Regulation 4040 and its authorizing provisions in the city charter were unconstitutional (conclusion 18).

[3] Return on investment standards have been subsequently approved in *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261], *post,* at p. 988.

[4] Under this plan rents are raised to cover increases in operating expenses and to allow increases in profit commensurate with inflation. Annual "general" (across-the-board) increases and "individual" (hardship) increases are allowed. (§ 1805.)

Board adopted regulations to satisfy the *Brooks-Scanlon* requirements and to replace section 1803(t), requiring the granting of a removal permit if the Board "determines that the landlord cannot make a fair return as constitutionally defined by retaining the controlled rental units on the rental housing market."

A hearing (phase IIIA) was held to determine the validity of the ordinance. The court ruled that it was unconstitutional,[5] being violative of due process because it provided no widespread, across-the-board mechanism to relieve the vast majority of landlords without the necessity of individual hearings; further, that the removal restrictions were preempted by state policy regarding housing development.[6]

By judgment filed July 14, 1983, the court enjoined City and Board ". . . from regulating or prohibiting, directly or indirectly, demolition of residential rental housing"[7] with certain limited exceptions, i.e., to ensure public safety, allow tenants time to seek alternate housing or upon showing that ". . . economic considerations are not a substantial factor in the owner's intentions in filing . . ." the permit.[8] Motions for stay of execution were made and denied. This court granted a writ of supersedeas on October 18, 1983.

---

[5]Section 1803(t) was subsequently approved by this division in *Blue Chip Properties* v. *Permanent Rent Control Bd.* (1985) 170 Cal.App.3d 648 [216 Cal.Rptr. 492], citing the California Supreme Court's prior partial approval as applied in *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 103 [207 Cal.Rptr. 285, 688 P.2d 894].

[6]The court found:

1. "The controls on demolition failed to yield a constitutional, i.e. non-confiscatory return under *Birkenfeld* v. *City of Berkeley* . . . ."

2. "The replacement ordinance effectively blocks (new) construction of buildings with more units than presently exists. Hence, it is contrary to state policy as enunciated by the state legislature. (See concurring opinion of Judge Marshall in *The Pines* v. *City of Santa Monica* (1981) 29 Cal.3d 656, 664-665.)"

3. "The lack of a generally self-executing across-the-board removal process (akin to the general adjustment for rent increases) deprives landlords of due process in violation of *Birkenfeld*."

[7]The court gave as its reasons: "This court has considered the analogy that there are two spouts and two corks on the steam kettle of the entire plan of rent control in Santa Monica. One cork restrains owners from 'releasing steam' by raising current rents. The second cork prevents owners from realizing capital gains by demolishing the property and putting it to a higher economic use. If the city chooses to release pressure under the first cork, then it would be logical to permit the city to tighten the cork on the second spout which controls demolition."

[8]The injunction permitted City and Board "To enact a regulation providing that if, within 45 days of the filing of an application for demolition permit, the city makes a good faith finding based upon clear and convincing evidentiary testimony that economic considerations are not a substantial factor for a demolition permit, the city may then, and only then, reject such application; . . ."

CONTENTIONS

City and Board contend that: The trial court erred in enjoining enforcement of the removal portion of the rent control law because: it misapplied the law (essentially the Supreme Court's holdings in *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001]) in determining that a municipal rent control ordinance must guarantee to owners: (a) fair return on the *value* of their *property;* (b) protected anticipated appreciation; (c) self-executing or ministerial procedures for removal via demolition or change of use; and (d) protection from the combination of rent ceilings *and* removal restrictions.

Baker and Stein contend that: (e) The trial court erred in not finding regulations 4100-4111 unconstitutional on their face because they will necessarily fail to allow a substantial number of efficient landlords a just and reasonable return on their properties.

SUMMARY

Except for its decision that regulations 4100-4111 are constitutional, the trial court misapplied the holdings and dicta of *Birkenfeld, supra,* to impose "return" and "removal" standards upon City and Board which are too stringent, not required by any known precedent, and therefore dictating a reversal.

DISCUSSION

The basic question on this appeal is: Did the trial court apply the proper constitutional standards in its analysis of the rent ceiling and removal restrictions of the Santa Monica rent control provisions? We determine here that it did not. On occasion a studious judge selects from the books a legal intimation and with it constructs housing for the case, only later to learn that what he adopted as a plan was instead just the primitive etchings of an earlier builder who now, joining others with the collected developing force of a stormy sea, beats the building into the beach. Since entry of the judgment below, enjoining enforcement of portions of the rent control law, the infrastructure on which its holdings were based has been demolished by several significant subsequent appellate cases. Its reliance upon fair market value standards for determining a "fair and reasonable return" to landlords permeates and affects the entire decision of the trial court.

It is clear that the court adopted the "fair market value" standard very early in the proceedings. In its memorandum of intended decision of March 6, 1981, is written: "The Rent Control Ordinance and its implementing

regulation 4040 allegedly are founded upon the theory that the property owners are entitled to no more return than that which is calculated upon the historical investment of each particular landlord measured at the time the landlord acquired his property. But *Birkenfeld*[9] teaches at page 165 that 'The provisions are within the police power if they are reasonably calculated to eliminate excessive rents and at the same time *provide landlords with a just and reasonable return on their property.*' (Emphasis added.)"

Thereafter, and throughout the subsequent proceedings, references were made to that standard in memoranda, punctuating its significance in other determinations; (e.g., see citation of Evidence Code section 811, defining "value of property" to mean "market value"; holding that "historical investment" is a constitutionally impermissible standard; holding, for purposes of preserving the constitutionality of a portion of the adjustments section, "return on investment" to mean "return on property" (phase I); disagreeing with the "unworkable circularity" of "value based criterion" analysis of *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65] (phase II memorandum of intended decision, Feb. 17, 1982); determining, in effect, that section 1803(t) precludes the realization of reasonably anticipated increase in value at the end of the holding period (phase III, memorandum of intended decision, June 18, 1982); holding in the judgment of July 14, 1983, that fair market value is the mandated standard.

a. *The Trial Court Erred in Concluding That Fair Market Value Is the Standard Mandated for Determining a Fair Return to Landlords*

Any reliance upon the fair market value standard for these purposes is seriously misplaced. Recently it has been rejected by the courts considering it. (*Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 287 [195 Cal.Rptr. 825].) Originally employed by the United States Supreme Court in an early railroad rate case (*Smyth* v. *Ames* (1898) 169 U.S. 466 [42 L.Ed. 819, 18 S.Ct. 418]), it was later rejected because, ". . . rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings upon whatever rates may be anticipated." (*Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 601-602 [88 L.Ed. 333, 344, 64 S.Ct. 281]; see generally *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, fn. 33, p. 680 [209 Cal.Rptr. 682, 693 P.2d 261].) California appellate courts have been consistent in the rejection.

In *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362 [190 Cal.Rptr. 866], Division Five of this district found nothing in *Birkenfeld, supra,* that would guarantee to landlords a fair return

---

[9]Reference is to *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d 129.

on the present fair value of their property and noted its specific rejection in rent control cases. (*Id.*, p. 370, citing *Helmsley* v. *Borough of Fort Lee, supra,* at p. 72, as stating: "... a value-based criterion for confiscation under rent control is practically unworkable.")

The Fifth District of this court stated in *Cotati, supra:* "We reject landlords' contention that a 'return on value' standard is mandated in order for a rent control ordinance to pass constitutional muster. The fatal flaw in the return on value standard is that income property most commonly is valued through capitalization of its income. Thus, the process of making individual rent adjustments on the basis of a return on value standard is meaningless because it is inevitably circular: value is determined by rental income, the amount of which is in turn set according to value. Use of a return on value standard would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as those which would be charged in the absence of regulation. . . . Rent control utilizing this standard is no rent control at all." (148 Cal.App.3d 280, 287.) *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72 [191 Cal.Rptr. 47], was criticized for concluding that the return on value standard is required based upon *Birkenfeld* and *Helmsley, supra.*

In *Oceanside Mobile Home Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239], the Fourth District of this court concurred with the opinions in both *Cotati* and *Palos Verdes Shores, supra,* in rejecting the contention that such a standard is constitutionally required. (*Id.*, p. 898.) It stressed the process' inevitable circularity, citing *Helmsley, supra.*

Then the California Supreme Court in *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, after concluding that rent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula (at p. 680), provided some sense of direction regarding the selection of standards, but no support for the choice of the trial court in this case. In rather telling footnotes it observes, inter alia: that circularity problems exist when fair market value concepts are applied in the rent control context; that use of such a standard would thoroughly undermine rent control (*id.*, p. 681) and finally stating: "[W]e wish to dispel suggestions based on dictum in *Birkenfeld* that we have previously established, as a constitutional test, a requirement that rent controls must provide landlords a 'just and reasonable return on their property'. . . . This statement was made in the context of a broader discussion of the legitimate exercise of local police power, and was most certainly not intended to articulate a constitutional standard. Birkenfeld's reference to the term 'property' should

therefore be viewed with caution; it would be inappropriate to suggest that the *Birkenfeld* statement can be used to predict the specific constitutional standard that we will articulate when we review a challenge to rent control as applied."

The trial court simply misapplied the Supreme Court's dictum in *Birkenfeld* in concluding that rent control law must guarantee owners a fair return on the value of their properties.

b. *The Trial Court Erred in Concluding That Constitutional Requirements Mandate That a Rent Control Ordinance Guarantee to Owners Anticipated Appreciation*

In addition to its position that return on value of property is a proper standard, the trial court would extend the significance of that value to the present and future on the belief that its appreciation is constitutionally protected, in other words, that the reasonableness of rents is dependent upon appreciation of that value. In its judgment of July 14, 1983, the trial court found:

"10. The net rental income realized by landlords on April 10, 1978, did not provide them with a just and reasonable *return on the value of their property if anticipated appreciation be excluded* . . . .

"12. Sections 1805(f) and (g) are unconstitutional in that they:

"(a) deny owners their constitutional right to a just and reasonable return on their property; . . .

"(c) appropriate *past return in the form of appreciation.* . . ." (Italics added.)

Further, in its announcement of intended decision phase IIIA of December 29, 1982, the trial court stated: "The City cannot have it both ways. If the City had been unable in Phase II to show the likelihood that the owners may eventually realize a *capital gain at the time of demolition,* then this court would have declared regulation 4100 unconstitutional in view of the low net operating income permitted to owners in contrast to returns on other types of investment. . . ."

It then found: ". . . [U]pon the basis of all of the economic evidence offered in the case that the existence of such demolition controls does not provide a constitutional, i.e. non-confiscatory[,] return to the large majority of the owners of controlled rental housing in Santa Monica."

From these portions of the record it is clear that the trial court based the ultimate finding that the combined effect of rental control and removal

restrictions is confiscatory upon the perception that the removal restrictions eliminate the capital gain (appreciation) portion of the total return. Once again, the trial court's handiwork is undone by intervening subsequent appellate decisions, indicating not only a lack of constitutional protection for appreciation, but rather considerable sufferance of *depreciation* in a rent control context.

The *Cotati, supra,* court stated at page 290: "Landlords argue that the investment-based standard of the ordinance unfairly deprives [them] of any long-term appreciation in the value of their property. Some lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income. (See *Helmsley* v. *Borough of Fort Lee, supra,* at p. 72 [rent control 'limits the potential growth of . . . income stream, and also therefore, the potential capital appreciation on resale.'].) It is one of the very sources of long-term appreciation—inflated rents—that rent control measures are intended to restrict." The *Fisher* court cites *Cotati* to the same effect, at page 685; and in *Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256, 267 [217 Cal.Rptr. 1, 703 P.2d 339], the California Supreme Court "note[s] in *Fisher,* [that] most land use regulations have 'the inevitable effect of reducing the value of regulated properties.' . . . Such reduction in property value does not, by itself, render a regulation unconstitutional. 'Even a significant diminution in value is insufficient to establish a confiscatory taking. (*Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] [75 percent reduction in value because of zoning law insufficient to establish taking]; *Hadacheck* v. *Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143] [nearly 90 percent reduction in value because of use restriction insufficient to establish a taking].)' (37 Cal.3d at p. 686.)" It follows therefore, that a rent control ordinance which does not guarantee anticipated appreciation in property values is not thereby rendered unconstitutional. (See also *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 520-523 [125 Cal.Rptr. 365, 542 P.2d 237] and *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25] affd. (1980) 447 U.S. 255, 261-262 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138].)

■ The *Cotati* case also addresses the question of whether the rent control law impermissibly discriminates among several situated properties, thereby denying landlords equal protection of the laws. We conclude that it does not, for the reasons set forth at 148 Cal.App.3d 291: "Landlords contend that the investment-based standard will yield disparate returns as between identical properties purchased years apart for widely differing prices . . . . [¶] Even if the rents are viewed as the proper measure and disparity is perceived, such disparate treatment does not violate equal protection guarantees. Equal protection is not denied simply because an ordinance

treats one class of persons differently from another. Where there is no suspect classification, and purely economic interests are involved, a municipality may impose any distinction which bears some 'rational relationship' to a legitimate public purpose. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 395 [148 Cal.Rptr. 375, 584 P.2d 512].)''

c. *The Trial Court Erred in Concluding That a Municipal Rent Control Ordinance Must Provide Self-executing or Ministerial Procedures for Removal From Controls via Demolition or Change of Use (Conversion)*

Following through on its premise regarding the viability of the fair market value standard and its commitment to the assumptions that any postponement of capital gain under rent controls operates to eliminate appreciation of land value for the period of that postponement and that capital gain can only be realized upon demolition, the trial court concluded that the removal regulations did not allow an owner to demolish when he was not earning a fair return and, therefore, the combined effect of rent controls and removal controls was confiscatory. In other words, to be valid, permitting a fair return, the ordinance must permit the owner to realize the reversionary value of the underlying land at any given time, *at will,* as it were. Besides, reasons the court further, the Board's category B removal proceedings are unnecessarily burdensome under *Birkenfeld.* Its primary concern was with delay in obtaining that reversionary value under the mechanism.[10] We conclude that the concern is misplaced, upon a careful consideration of the relevant regulations. There is an insufficient showing on the record either that evidence concerning eventual capital gain is required, or that there must be separate hearings for each individual unit, the principal sources of the burden envisioned. They are required neither by the regulations nor the necessary implications of practice, according to the evidence.[11] On the contrary,

---

[10]In its phase IIIA statement of decision, the trial court first paraphrased a portion of the regulations to the effect: ''. . . that any owner who contends that he or she is not realizing a fair return from a particular unit must assume the onerous burden of proof that the unit does not yield *a total return, i.e. return from net operating income and future anticipated capital gain upon demolition* to satisfy his or her constitutional right to a fair return.'' (Italics added.) and concluded: ''In order for any petitioner for Category B removal permit to make an administrative record sufficient to prove his or her constitutional position for reviewing courts upon administrative mandamus review, such owner would have to make a showing involving *many days* of hearing, and much expenditure of attorney's and expert fees, *for each unit he or she owns.* I find that the placing of such a burden would deprive each owner of administrative due process. Because of the time, expense and expertise required, owners could not effectively file and establish these petitions.'' (Italics added.)

[11]The regulations in fact provide:

''[Section] . . . 5012 . . .

''(a) *Category B.*

''The Board shall grant a removal permit if it finds that the current MAR (Maximum Allowable Rent) for the unit does not provide a *fair return* and that the landlord cannot rent

multiple treatment of units appears to be presumed. The court itself described the standard for calculation as "simple" and "objective."

Again, recent cases are most instructive on the issues raised. The California Supreme Court in *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 109 [207 Cal.Rptr. 285, 688 P.2d 894], stated: "[I]n the context of a land-use ordinance the requirement of section 1803, subdivision [t], that a predemolition removal permit must be obtained before a landlord may level his or her rental units is reasonably related to the legitimate goals of maintaining adequate rental housing for Santa Monica's citizens. There can be no doubt that the relationship of the ordinance to the public welfare is both 'real and substantial.'" Thus holding the removal restrictions here constitutional.

This division, in *Blue Chip Properties* v. *Permanent Rent Control Board* (1985) 170 Cal.App.3d 648 [216 Cal.Rptr. 492], went so far as to approve this section and that combination of subparts which the trial court found so objectionable.[12] It allowed the prohibition of a removal permit even after the owner had reached some stage in the process of conversion, indicating the extent to which courts will endeavor to uphold removal provisions.

The *Nash* court, *supra,* outlined some parameters of an owner's vulnerabilities when exposed to the removal provisions of rent control.

"The state Constitution protects the rights of 'acquiring, possessing and protecting property. . . .' (Cal. Const., art. I, § 1.) Both federal and state Constitutions protect against deprivation of property without due process of law. Yet, '"It is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. *Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires.*"' (*Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479].) (Italics added.) "Thus, an ordinance restrictive of property use will be upheld, against due process

---

the unit at that rent necessary to provide the landlord with a *fair return* . . .

"(e) . . . . . . . . . . . . . . . . . . . . . . . . .
"The Board shall grant a Category . . . B . . . removal permit with respect to a rental unit if it finds that the MAR's of individual *units which the landlord owns on the same property* cannot be adjusted so as to enable the landlord to collect an overall fair return. . . ." (Italics added.)

[12]Section 1803(t) specifies that the Board may issue a removal permit (a) if the rental units are uninhabitable and incapable of being made inhabitable economically or, (b) if the landlord both owns habitable property and does not wish to rebuild, upon findings that (1) the building is not occupied by persons of low or moderate income, (2) cannot be afforded by persons of low or moderate income, (3) removal will not adversely affect the housing supply, and (4) the owner cannot make a reasonable return on his investment.

attack, unless its provisions 'are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.' (*Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 395 [71 L.Ed. 303, 314, 47 S.Ct. 114, 54 A.L.R. 1016].)" (*Nash, supra,* at p. 103.) (See also *Groch* v. *City of Berkeley* (1981) 118 Cal.App.3d 518, 525 [173 Cal.Rptr. 534] where demolition controls are required to preserve rental housing; and other jurisdictions in agreement: "If the power to control rents is to be anything more than an interim measure effective only for the short period needed to convert the entire rental housing stock, it must include by implication the power to make reasonable regulations governing removal from the rental housing market." (*Flynn* v. *City of Cambridge* (1981) 383 Mass. 152, 158 [418 N.E.2d 335, 338-339, 21 A.L.R.4th 1075].)[13]

Such controls may be viewed as adjuncts to limitations upon eviction which have generally been upheld by the courts, with some limited exceptions. (See *Birkenfeld, supra,* at p. 148.)

We join the trial court in its concern, however, that the practical effect of the removal procedure must not be so "cumbersome and pregnant with unnecessary delay that it will necessarily be confiscatory in many cases" as proscribed by *Carson Mobilehome Park Owners' Ass'n* v. *City of Carson* (1983) 35 Cal.3d 184 [197 Cal.Rptr. 284, 672 P.2d 1297].

In *Carson,* the California Supreme Court unanimously upheld procedures of an ordinance against the charge that the delays inherent in its provisions for notice, hearing and decision, combined with the lack of any mechanism for a general rent adjustment made it unconstitutional under *Birkenfeld.* After pointing out that "'"[P]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them"'' [citation]," the court noted that some delay is inherent in all rent control procedures, but that only those delays which are longer than practically necessary to achieve the legitimate purposes of the legislation are constitutionally proscribed (*id.* at p. 192). It then approved a provision allowing the Board a maximum of 105 days to act on an application (*id.,* at p. 193); and in *Oceanside Mobile Home Park Owners' Ass'n* v. *City of Oceanside* (1984) 157 Cal.App.3d 887, 901 [204 Cal.Rptr. 239], the Court of Appeal ruled a 110-day delay between application and effective date of rent increase ". . . not substantially greater than is prac-

---

[13]In at least one jurisdiction the courts have gone so far as to uphold prohibition against conversion even to the owner's personal use, on the grounds "the Legislature could constitutionally decide . . . that an owner's right to utilize his property must yield to a tenant's interest in keeping his home. . . ." (*Puttrich* v. *Smith* (1979) 170 N.J. Super. 572 [407 A.2d 842, 843].)

tically necessary and thus, . . . reasonable and constitutionally permissible" (citing *Birkenfeld, supra,* at p. 901).

The facts of this case compare favorably with those in *Carson* and *Oceanside.* Certainly the analysis by which the rent adjustment mechanism was found invalid in *Birkenfeld* does not apply here. But even if it did, the Santa Monica process does not subject owners to the enormous procedural barriers to relief which resulted in the invalidation of the *Berkeley* mechanism; e.g., in *Berkeley* each of the 16,000 controlled units seeking adjustments required an individual hearing; there was no express limit on the amount of time within which a decision had to be made; the Board had to decide each case itself; the owner had to simultaneously file a certificate from city building inspection services, etc., including numerous other limitations which placed the Board in a "procedural strait jacket."

Conversely, in this case, under ordinance No. 1255, the Board is not only required to make a final decision within 120 days,[14] but does so as a matter of practice; the removal process does not *require* the Board to hear separate petitions for each unit and, as a matter of fact, it is abundantly clear from the record that the practice is to treat numerous units in connection with an application; nor does the Board bear the entire burden of the hearings, since regulation 5014(b) provides for delegation of fair return hearing and analysis to a hearing examiner. In any event, there is no showing that resulting delays were any "longer than practically necessary to achieve the legitimate purposes of (rent control)" as is currently required by the unequivocal language of *Oceanside* and *Carson.* Even though there is no constitutional or other requirement that owners have a self-executing, ministerial or "at will" procedure for removal of their units from rent controls, the mechanism must be such as will avoid unnecessary, cumbersome and confiscatory delay. We cannot find, from the record of this case that either the ordinance, regulations or procedures as applied thereunder are clearly arbitrary, unreasonable and without a substantial relation to the public health, safety, morals or general welfare of the citizens of Santa Monica under *Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016].

Even though Baker, who had never filed a petition with the Board himself, was permitted to speculate (based upon a sample of owner opinions expressed in two seminars which he hosted) that the "highly educated and sophisticated and experienced" landlord would require "at least 80 hours" to complete the 18-page petition, that would hardly appear to be the fault of the City,

---

[14]This requirement was affected by an amendment to the Santa Monica City Charter in November 1984. (Art. XVIII, § 1803(t)(4).)

the Board, the ordinance and their procedures. According to Baker, the owners' individual difficulties with the petition related to such things as: their improperly maintained or non-existent business records; ". . . fear that giving its (a manager-occupied apartment) proper value and then deducting it as an expense . . . then the expense (being) disallowed, and (owner) shown to have a higher income than really existed"; how much "jeopardy (you are) putting yourself in by establishing such a value"; and ". . . guesswork having to do with what they think the Rent Board would approve, what they think their residents can live with, what they need to survive with. . . ."

Board procedures afford much assistance to owners who have questions, e.g., an "information coordinator" is primarily responsible to help the public, answer questions in person, by phone and in writing and at least one staff attorney, the "officer of the day," is made available to receive legal and technical questions. Referrals are also made to the apartment owners' association. The requirements of *Birkenfeld* are satisfied.

In view of our discussion above and the overwhelming authority heretofore cited, the remaining two issues can be summarily disposed of.

d. *The Trial Court Erred in Concluding That Owners Are Protected From the Combination of Rent Control and Removal Restrictions*

We have been unable to find, nor have we been directed to, any authority whatsoever for the "choice" which the trial court would impose upon City and Board under its "two cork" theory. (See fn. 7, p. 977, *ante*.) That a rent control City should be forced to an election between restraints on raising rents and controls on demolition and use changes is not only exceptional, but unprecedented under the cases. As a matter of fact, precedents point in the opposite direction. In *Griffin Development Co.* v. *City of Oxnard, supra, Fisher* v. *City of Berkeley, supra, Blue Chip Properties* v. *Permanent Rent Control Board, supra, Nash* v. *City of Santa Monica, supra,* the combination of rent controls and removal restrictions was approved without the slightest inference or foreboding of fatal flaw as suggested by the court below. Indeed, *Blue Chip* and *Nash* treated precisely the removal provisions of section 1803(t) with which we are here concerned.

We observe, in passing, that the trial court's misgivings that section 1803(t) and regulations amount to restraints on alienation and violate Civil Code section 711 are now absolved by the holding in *Fisher,* at page 692, that the section was never intended to apply to municipal ordinances, but addresses only private restraint and not government regulations. (See also

*Blue Chip, supra,* at p. 656.) Finally, the trial court was correct in holding regulation 4100 constitutional.

e. *The Trial Court Did Not Err in Finding Regulations 4100-4111 Facially Constitutional*

 "Net Operating Income" standards, such as Santa Monica's regulation 4100 et seq. (fn. 4, p. 976, *ante*), essentially a return on investment standard, have been approved by California courts (see *Cotati, supra,* at p. 289; *Gregory, supra,* at pp. 85-86) including the California Supreme Court in *Fisher, supra,* at pages 680-683.

For the reasons set forth at a, b, c, and d above, the judgment is reversed.

Danielson, Acting P. J., and Arabian, J., concurred.

A petition for a rehearing was denied June 26, 1986, and the petition of plaintiffs and appellants for review by the Supreme Court was denied September 19, 1986. Mosk, J., Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.