JOE J. MAYES, TRADING AS JACKSON ESTATES, PLAINTIFF-AP-
PELLANT, v. JACKSON TOWNSHIP RENT LEVELING
BOARD, TOWNSHIP OF JACKSON AND JACKSON TOWNSHIP
COMMITTEE, DEFENDANTS-RESPONDENTS,

AND

JACKSON ESTATES MOBILE HOME-OWNERS ASSOCIATION,
INTERVENOR-RESPONDENT.

HAMILTON TOWERS, INC., A NEW JERSEY CORPORATION AND
FULTON HOUSE ASSOCIATES, A LIMITED PARTNERSHIP
OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v. TOWNSHIP OF WEEHAWKEN, A BODY POLITIC, AND THE
RENT LEVELING BOARD OF THE TOWNSHIP OF WEE-
HAWKEN, DEFENDANTS-RESPONDENTS.

Argued March 4, 1986—Decided July 1, 1986.

*Michael E. Levin* argued the cause for appellant Joe J. Mayes, etc. (*Levin, Shea & Pfeffer*, attorneys; *Michael E. Levin*, and *Margaret McMahon*, on the briefs).

*James J. Byrnes* argued the cause for appellants Hamilton Towers, Inc., etc., et al. (*Byrnes & Guidera*, attorneys).

*Joseph F. Martone* argued the cause for respondents Jackson Township Rent Leveling Board, et al. (*Stanzione, Stanzione, Martone & Rosen,* attorneys).

*Connie M. Pascale* argued the cause for intervenor-respondent.

*Richard P. Venino* argued the cause for respondents Township of Weehawken, etc., et al. (*Venino and Venino,* attorneys).

*Christopher J. Hanlon* submitted a brief in *Mayes v. Jackson Township Rent Leveling Board* on behalf of *amicus curiae* Manufactured Housing Assoc., Inc. in New Jersey (*Gross & Hanlon,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

These cases present challenges to certain rent control provisions found in two municipal ordinances. Both ordinances use an investment-based formula to determine adjustments of allowable rents to assure a fair return to the owners. In both cases the Law Division upheld the ordinances and the Appellate Division affirmed substantially for the reasons stated by the trial court. We granted certification in these two cases, 102 *N.J.* 318 (1985), because of an apparent conflict in the decisions below as to whether an investment-based formula for determining fair return requires an adjustment of the investment figure for inflation. The cases were argued together and this opinion disposes of both.

Because the provisions of the two ordinances are otherwise so dissimilar in context and effect, we find no inherent conflict in the decisions. Because neither record below demonstrates that either ordinance [1] as applied fails to provide a fair return to the owner, we affirm the two judgments.

---

[1] We refer to the ordinances as they existed at the time of application.

## I

The Weehawken case involves a challenge to rent allowances for the years 1979 and 1980. The property involved is a 57–unit, eight-story apartment building constructed in 1964. The average monthly rentals for the relevant years were approximately $289 to $300 per apartment. The building is uniquely located with a skyline view of Manhattan.

Plaintiff Hamilton Towers, Inc. is the owner of the apartment building, which is operated by plaintiff Fulton House Associates. For purposes of analysis, the plaintiffs' expenses were combined to constitute the landlord's expenses.

Weehawken adopted a rent control ordinance effective January 1, 1974. At the time of plaintiffs' application, the ordinance allowed (1) an automatic inflationary increase of four percent a year in base rent, (2) tax surcharges to tenants for increases in municipal property taxes, and (3) a hardship increase if the landlord cannot (a) meet operating expenses or (b) make a fair return on investment. The Weehawken ordinance defines a fair return on investment as up to six percent above available passbook interest rates applied essentially to the owner's cash investment in the property.[2]

The Jackson Township case involves an application for rental increases for a 165–space mobile home park. The average monthly rentals allowed for the park for 1982 were $143.61 on 150 spaces and $148.83 on nine spaces in the park.

---

[2] The ordinance provides that "fair return" means "the percentage of return on equity in a real property investment." Equity is determined by the "actual purchase price minus any and all existing liens on the property." Further, the amount of return is "measured by the net income before depreciation." A fair return on the equity investment in real property is "considered to be up to six percent above the maximum passbook demand deposit savings account interest rate available in the Township." Of the six percent, three percent reflects the higher risk, and the other three percent reflects the lesser liquidity of a real estate investment as opposed to other investments.

Jackson Township adopted an ordinance applicable to mobile-home rentals in 1973. The ordinance permits (1) automatic inflationary adjustments based upon a portion of the percentage increase in the Consumer Price Index,[3] (2) automatic tax surcharges based on increases in municipal property taxes, and (3) hardship increases whenever rental and other income from operation of the park is insufficient to provide for interest payments on mortgages, reasonable and necessary expenses incurred in connection with the operation of the mobile home park, and "a return on the owner's actual balance of such investment in the mobile home park in an amount not to exceed seven and one-half percent."[4] The Jackson Township ordinance does not define "actual balance of such investment"; it was interpreted by the Rent Leveling Board "to mean the owner's actual cash investment in the park after deducting that portion of the owner's investment which has been financed through mortgages."

Both ordinances contain provisions for additional rental charges for one-time capital improvements, as well as procedures for requesting hardship increases.

We shall state the principles generally as to judicial control of rent control decisions, apply them to the two records before us, and, finally, offer certain suggestions with respect to any recurring litigation in this field.

---

[3]The percentage increase in the Jackson Code is applied to the tenant's existing base rent as follows:
> (1) 60% of the percentage increase in the Consumer Price Index (CPI) on the first $100 of base rent;
> (2) 40% of the percentage increase in the CPI on the next $50 of base rent;
> (3) 25% of the percentage increase in the CPI on the next $50 of base rent;
> (4) 10% of the percentage increase in the CPI on that portion of the base rent that exceeds $200.

[4]In companion litigation, the trial court held that under the Jackson rent control ordinance an applicant need not initially elect between the CPI and hardship relief routes.

## II

■ Stating the general principle applicable to these cases is easy. "[A] rent control ordinance must permit an efficient landlord to realize a 'just and reasonable return' on [the] property." *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 210 (1978), *appeal dismissed*, 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.* 2d 237 (1979) (quoting *Hutton Park Gardens v. Town Council of West Orange*, 68 *N.J.* 543, 568 (1975)). Deciding what is a "just and reasonable return" in a given case can be very difficult.

The varied methods that may be used to determine fair return are described by Kenneth Baar in *Guidelines for Drafting Rent Control Laws: Lessons of a Decade*, 35 *Rutgers L. Rev.* 723 (1983):

> The most commonly used fair return standards are return on value, return on equity, return on gross rent, percentage net operating income, cash flow, and maintenance of net operating income. There are substantial differences in the manner in which each of these formulas operates and in the classes of landlords and tenants which they benefit. [*Id.* at 784.]

In this case, both ordinances purported to use the return-on-equity standard. Under the formula as used in these ordinances, allowable rent appears to cover at least operating expenses, mortgage interest payments, and a percentage of cash investment. The Weehawken and Jackson ordinances use investment-based approaches to determining fair return on equity. The use of such a formula was presaged in *Helmsley, supra.* In that case the Court noted:

> In view of the lack of evidence concerning plaintiffs' investment, we offer no comments on investment-based criteria for determining confiscation. Our silence does not, however, denote disapproval. Other jurisdictions have employed such criteria. See, *e.g., Marshal House, Inc. v. Rent Control Bd. of Brookline*, 358 *Mass.* 686, 266 *N.E.* 2d 876, 888 (1971). Although an investment-based standard may not be as easy to apply as some income-based criteria, there are no obvious theoretical obstacles to using an investment-based standard. [78 *N.J.* at 216 n. 8.]

Facial challenges to investment-based formulas assert a discrepancy in that similarly-situated operators would be authorized to receive different rents under the same rent control

scheme depending upon when and how much owners originally invested in the property. This point was raised in *Cotati Alliance for Better Hous. v. City of Cotati*, 148 *Cal.App*.3d 280, 195 *Cal.Rptr.* 825 (Ct.App.1983). In *Cotati*, a California intermediate court rejected a facial challenge to an ordinance that used an investment-based standard, holding that

a local rent control ordinance which requires that landlords receive a fair and reasonable return on their investment is constitutionally valid on its face as a form of economic regulation reasonably related to the furtherance of a legitimate governmental purpose. Further[more], * * * provisions of the ordinance fixing the maximum rent which can be charged are reasonably calculated to eliminate excessive rents and, at the same time, provide landlords with a just and reasonable return on their property * * *. [*Id.* at 283, 195 *Cal.Rptr.* at 827.]

In *Cotati*, the court rejected a constitutional challenge to the ordinance because it was a valid form of economic regulation reasonably related to a legitimate public purpose; moreover, the court stated that "[t]he investment-based standard, unlike a value-based standard, ensures that inflationary factors will not be built into a rent control ordinance's rent ceiling adjustment mechanism, and thereby ensures the integrity of the entire rent control scheme." *Id.* at 292, 195 *Cal.Rptr.* at 833. The appellate court rejected the landlord's contention, which had been accepted by the trial court, "that a 'return on value' standard is mandated in order for a rent control ordinance to pass constitutional muster." *Id.* at 287, 195 *Cal.Rptr.* at 829. It cited favorably this Court's decision in *Helmsley v. Borough of Fort Lee*, *supra*, particularly the notion that " '[o]nce income is controlled, * * * using capitalization of income to determine value to regulate future income is a circular process.' " *Cotati*, 148 *Cal.App*.3d at 287, 195 *Cal.Rptr.* at 830 (quoting *Helmsley, supra*, 78 *N.J.* at 214). It noted that "[r]eturn on investment has been characterized as the 'governing standard' in Massachusetts * * *." 148 *Cal.App*.3d at 288, 195 *Cal.Rptr.* at 830 (citing *Zussman v. Rent Control Bd. of Brookline*, 371 *Mass.* 632, 638, 359 *N.E.* 2d 29, 32 (1976)).

The court in *Cotati* was able to sustain the ordinance because the undefined return-on-investment standard afforded the

board sufficient flexibility to avoid confiscatory results because return on investment was not limited to initial or cash investment and the original investment could be equated with current dollar values so as to assure a fair return. 148 *Cal.App.*3d at 289, 195 *Cal.Rptr.* at 831. The court rejected an equal protection challenge simply because, though the ordinance treated one class of persons differently from another, there was "a rational relationship to a legitimate public purpose." *Id.* at 292, 195 *Cal.Rptr.* at 833. It noted that rent control has historically been imposed for emergency purposes. *Id.* Finally, the court set forth a series of pertinent factors to be considered by a rent leveling board.[5] *Id.* at 294–95, 195 *Cal.Rptr.* at 835.

The California Supreme Court recently sustained these principles, holding that the City of Berkeley's fair-return-on-investment standard would not preclude the board from avoiding confiscatory results. *Fisher v. City of Berkeley*, 37 *Cal.* 3d 644, 682, 693 *P.*2d 261, 291, 209 *Cal.Rptr.* 682, 712 (1984) (en banc), *aff'd on other grounds*, 475 *U.S.* ——, 106 *S.Ct.* 1045, 89 *L.Ed.* 2d 206 (1986). It reiterated "that selection of an administrative standard by which to set rent ceilings is a task for local governments—in this case the voters themselves—and not the courts." 37 *Cal.*3d at 681, 693 *P.* 2d at 291, 209 *Cal.Rptr.* at 712. The court's only concern was whether the "defendants'

---

[5]The additional factors suggested by the court included the following:

    1. Societal importance of ensuring that real estate remains a viable investment so that the rental housing stock is maintained, improved and replenished.

    2. The return appropriate to this type of investment to attract and retain investors. * * *

    3. Tax benefits to the landlord, including consideration of comparable tax benefits in other types of investments. * * *

    4. The physical location of the property and the types of tenants. * * *

    5. Particular hardship circumstances of the owner.

    6. The effects of the decrease in the purchasing power of the dollar during inflationary periods. * * *

[*Cotati Alliance for Better Hous. v. City of Cotati*, 148 *Cal.App.*3d 280, 295, 195 *Cal.Rptr.* 825, 835 (Ct.App.1983)].

fair return on investment standard, on its face, will not permit those who administer it to avoid confiscatory results." *Id.* (footnote omitted). Again, in rejecting a facial challenge, that court noted that no formula may indefinitely freeze the dollar amount of a landlord's profits "without eventually causing confiscatory results." *Id.* at 683, 693 *P.* 2d at 292, 209 *Cal. Rptr.* at 713 (citing *Cotati, supra,* 148 *Cal.App.*3d at 293, 195 *Cal.Rptr.* at 833). On appeal, the United States Supreme Court held that the Berkeley ordinance was not unconstitutional as being preempted by the Sherman Act; the Court did not, however, consider any fair return issues. 475 *U.S.* at ——, 106 *S.Ct.* at 1048, 89 *L.Ed.* 2d at 211.

It will be seen at once that neither California decision advances the underlying question of what indeed is a fair return.

This Court has stated that it is inappropriate for a community to adopt a rent control ordinance without definitive standards. *See, e.g., Troy Hills Village v. Township Council of Parsippany-Troy Hills,* 68 *N.J.* 604, 620–21 (1975) (rent control ordinances should set forth standards and criteria by which the parties, the local rent control agency, and reviewing tribunals can be guided in determining adequacy of returns actually received under the ordinance). Hence, we believe that the attempts of these two municipalities are preferable to the kind of open-ended approach found in the *Cotati* case. Nonetheless, neither ordinance answers the ultimate constitutional question of what is a fair return. That question remains for a judicial determination of whether, as applied, the ordinance affords the investor the constitutional minimum. It is to this that we must address ourselves.

## III

### A.

The central challenge to the Jackson rent control ordinance is that its flat seven and one-half percent limit on return fails to respond to true market conditions and is therefore inherently confiscatory. However, as a result of companion

litigation in which plaintiff participated as an intervenor, the same trial court effectively amended the Jackson Township ordinance to adjust the investment base of the operator to reflect the owner's actual cash investment updated for inflation. (The opinion in the companion case, *United Mobile Homes, Inc. v. Township Comm. of Jackson,* was included as an exhibit in the proceedings.) Hence, the fundamental reasoning of the plaintiff no longer applies to the Jackson Township case since no truly fixed return is found in the ordinance but rather a rate applied to a base that floats with inflation.

In addition, although we do not have before us the full record made in the *United Mobile Homes* case that enabled the trial court to conclude that, as amended, the ordinance would not be confiscatory, we believe that enough appears to sustain that court's reasoning. In that case the court further modified the ordinance to permit the use of updated expense information. On the record before us, the plaintiff undertook to demonstrate by replacement-cost analysis or income-based analysis that comparable mobile home trailer parks operating in an unregulated economy would warrant monthly rent of $211. Plaintiff pointed to the illogic of an ordinance that limited him to a seven-percent return on cash investment when current market rates for certificates of deposit and passbook savings accounts were as much as sixteen percent. The trial judge noted that in *United Mobile Homes* it upheld the seven and one-half percent increase "notwithstanding the testimony of experts that in other types of investments rates of return in the 16 to 20 percent level could be realized without the type of risk associated with mobile homes." Plaintiff further pointed to a seemingly inconsistent provision of the ordinance that would have permitted an investor to loan money to the corporation instead of investing it and receiving the higher rates of current passbook accounts; the trial court interpreted this as merely a limit or cap on the interest rate that could be charged by a stockholder to his corporation and not a modification of the "clearly established 7½ percent rate." In sum, in this case the trial court applied a

rationale that it had employed in the companion litigation. It found the Jackson ordinance to be confiscatory to the extent that it did not adjust the owner's investment for inflation. Recall that in *Cotati* it was precisely this ability to adjust that original investment for inflation that enabled the ordinance to survive the facial challenge. *Cotati Alliance for Better Hous. v. City of Cotati, supra,* 148 *Cal.App.*3d at 288–90, 195 *Cal. Rptr.* at 831–32.

Turning then to the question of whether a seven and one-half percent return on adjusted investment is confiscatory, the trial court in *United Mobile Homes* concluded that real estate investors would not necessarily expect the same return as those in fixed-face amount investments such as certificates of deposit or treasury bills. It noted that the real estate investor has other commercial benefits, including, in some situations, tax shelter and an appreciating asset. We note in passing that some current government mortgage financing regulations contemplate an eight-percent return on equity. *See, e.g., N.J.S.A.* 55:16–5 (Limited-Dividend Nonprofit Housing Corporations or Associations Law limits repayment of investment to a sum equal to the shareholder's "investment plus cumulative dividends at a rate not to exceed 8% per annum"). In rental-apartment-assessment cases for contemporary taxable years, some capitalization rates for equity were set at eight percent, *River Drive Village v. City of Garfield,* 7 *N.J. Tax* 632, 642 (Tax Ct.1985), and nine and one-quarter percent, *Petrizzo v. Borough of Edgewater,* 2 *N.J. Tax* 197, 204 (Tax Ct.1981). The trial court noted that even if plaintiff Joe Mayes' investment base were adjusted for inflation, it would not require an increase above that allowed by the automatic inflationary process. We are unable to say that the trial court clearly erred in concluding the rate-of-return permitted under the ordinance was not confiscatory after the changes the court made. While reviewing courts remain free to rule on ultimate constitutional determinations, considerable deference remains to be paid to a trial court finding. *Zussman v. Rent Control Bd. of Brookline, supra,* 371 *Mass.* at 368, 359 *N.E.* 2d at 32.

## B.

■ In the Weehawken case, the challenge was not to the static rate of return on the investment, since Weehawken's rate floated up to six percent over current passbook demand deposit rates. A constitutional challenge was mounted at the trial level. Plaintiffs argued that there was an inherent illogic in an ordinance that allowed widely variant rents depending upon the amount of capital invested in the premises.[6] In an earlier decision incorporated by reference in *Weehawken,* the trial court ruled that despite its logic, this argument should be addressed to the governing bodies of the municipalities; absent a showing of unconstitutional confiscation, it does not present a court with an opportunity to rewrite the ordinance. We agree that an investment-based formula "bears a debatable rational relationship to a legitimate public purpose" that will survive an equal protection challenge. *Fisher v. City of Berkeley, supra,* 37 *Cal.* 3d at 684, 693 *P.* 2d at 293, 209 *Cal.Rptr.* at 714.

■ The plaintiffs' fair-return challenge was based upon a value-based theory of confiscation. Plaintiffs' expert witness posited a hypothetical investor for the premises and determined what he considered to be the typical market financing of seventy-percent capital and thirty-percent equity. The expert applied an anticipated profit rate to the thirty-percent equity and a predetermined constant to the seventy-percent mortgage to arrive at a weighted capitalization rate of .1207. Dividing this rate into net operating income in order to determine value resulted in the property's showing a considerable decline in value in 1979 and 1980: using this formula, for 1971 the value was $772,800, whereas for the period from July 1, 1979, to June 30, 1980, the value was $518,000.

The municipality's response to this was unexpected, to say the least. Its expert conceded the general validity of the plaintiffs' market data approach but suggested that the ex-

---

[6]The Weehawken ordinance does not appear to include mortgage interest as an expense before calculating return on investment. The board ruled in this case that even if mortgage interest were included, the return on equity would have been higher than the approximately eleven percent under the ordinance.

pense figures were disproportionate and asserted that the owner should have sought a reduction in taxes that would have had the effect of reducing expenses. In a candid colloquy with the trial court, the municipality's expert conceded the effect of the ordinance on the rental value of the property:

THE COURT: All right. Well, pardon me, that's what makes it such a lousy investment, that's what you're really saying. I mean, in theory, at least, if we left rent control over here somewhere wouldn't this housing inflate along with everything else, all things being equal, supply and demand, that's what we're trying to stop is the law of supply and demand?

THE WITNESS: Yes.

THE COURT: You're trying to cut that off. But, * * * you agree that this concept, this language in this ordinance and the way in which you arrive at return for your investment does not advance the legislative goal, but rather defeats it, because, as you've said, the value of this building is converting it to a condominium and taking it off the rental market. * * * [I]sn't that what you said before?

THE WITNESS: That would be the maximum value that could be ascertained for this particular building at the period of time that we are talking about.

THE COURT: Well, otherwise you would lose money on it?

THE WITNESS: Except, Your Honor, with—

THE COURT: Pardon me, just a minute, so maybe I don't understand you, and I want to be sure that I do. You say the one way to value it is a rental unit?

THE WITNESS: Yes.

THE COURT: Now, you agree that it has depreciated substantially as a rental unit, so therefore if you sold as a rental unit you would lose money on your investment. Did you say that, did I misunderstand you?

THE WITNESS: Yes, if that's exactly what you did, you would lose money, but no one would do that.

THE COURT: Well, pardon me, just a minute, the reason no one would do it is no one likes to lose money.

THE WITNESS: Correct.

THE COURT: All right. So, we would then encourage, because * * * continuing it as a rental unit is a losing proposition, to take it off the rental market and put it into something more profitable like a condominium?

THE WITNESS: Correct.

The trial court, however, felt itself bound by this Court's decision in *Helmsley* to conclude that it could not determine confiscation on a value-based standard because of the asserted circularity of the argument, the point being that of course rent control depreciates values. Accordingly, it declined to set aside the findings of the local rent control board on that basis.

No specific challenge or suggestion was made with respect to updating the original investment for inflation or taking into account the other factors suggested in *Cotati*.[7]   Again, we are left with a record that does not establish the confiscatory effect here.   Plaintiffs point to a decline in the net operating ratio of the building, showing that in 1977 the net operating expenses totalled 44.3 percent of gross while in 1980 they totalled 71.1 percent.   The trial judge declined to set aside the resolution on the basis of a declining net operating ratio.   He indicated that "plaintiff had an extremely profitable enterprise"; moreover, "if an income based standard were used in the Weehawken ordinance, plaintiff would be entitled to a modest hardship increase, but certainly not such an increase as to return it to its level of 1971 profitability."   In addition, there was apparent confusion concerning an inflated oil expense item caused by leaks in the system.   There was also evidence that heat was poorly distributed throughout the building and that plaintiff was an inefficient manager.   The trial court was of the view that though "there might be a landlord who is so situated as to suffer confiscation under the return on equity criteria * * * plaintiff at bar is not that landlord."

Since the date of its decision, we have been informed that the trial court's prophecy was self-fulfilling in that the property

[7]Adjusting the property owner's original investment to account for inflation from 1964 to 1980 (using the expert's inflationary figure of .375), the required return would have closely matched the actual return:

|  | Expressed in 1964 Dollars | Expressed in 1980 Dollars |
| --- | --- | --- |
| Costs and Improvements | $764,591.50 | |
| Less: Mortgages | 600,000.00 | |
| Investment Base | 164,591.50 | $438,910.66 |
| Fair Return Rate | 11.25% | 11.25% |
| Fair Return Amount | $ 18,516.54 | $ 49,377.45 |
| Actual Net Operating Income | | $ 45,935.00 |

We note that although increasing an investment base to adjust for inflation is not a constitutional imperative, it would be an almost complete answer to a claim of confiscation if the return on the original investment was reasonable in itself.

was in fact sold for a figure substantially above the income value with the purpose represented as condominium conversion. In short, given the heavy burden of proof that the plaintiffs have in these cases and the information furnished to us at oral argument that the premises have been sold with the apparent purpose to convert them to condominium uses, we cannot conclude that the trial court erred in its finding of no confiscation.[8]

## IV.

Each of these cases demonstrates, however, the difficulty that local agencies and reviewing courts have experienced in the administration of rent control ordinances. For example, in the Jackson Township case the constitutional challenge was attempted before the rent leveling board. That board, however, was operating pursuant to an ordinance that purported to decide what was a fair return. It is difficult to conceive how a board, under those circumstances, could effectively address a constitutional challenge. It would be arbitrary to depart from the provisions of its own ordinance. Conversely, in the Weehawken case, the constitutional challenge was raised directly in the Superior Court with the plenary trial of those issues being heard by the trial judge. Each of these approaches to determining constitutional return has its disadvantages. A local rent leveling board should have the fullest opportunity to consider all of the evidence bearing on what is a just and reasonable return.[9] In *Helmsley*, the Court recognized "that

[8]We also note that, pursuant to an interlocutory order issued in December 1980, the Law Division permitted a 12% rental increase pending litigation; the increase was to be held in an interest-bearing escrow account. Presumably the landlord would be entitled to the CPI or tax increases for the years in which rents were escrowed. The parties did not address this issue and we do not resolve it.

[9]Under Massachusetts procedures, the fair return decision is made by either a local board or a "rent control administrator." The fair return record made

many municipalities will continue to rely upon unpaid volunteer Rent Leveling Boards" that may " 'not have sufficient expertise to understand the complexities of rent regulation and real estate finance.' " *Helmsley v. Borough of Fort Lee, supra,* 78 *N.J.* at 233–34 (quoting Baar, *Rent Control in the 1970's: The Case of the New Jersey Tenants' Movement,* 28 *Hastings L.J.* 631 (1977)). It will probably remain necessary to permit constitutional challenges to be mounted in the courts although obviously the best record should be made before the rent control agency, which may resolve many of these issues.

There is a paradox here, as noted, in that we have insisted that municipal bodies act in accordance with standards that are not vague. At the same time, we have insisted that the only true test of the validity of an ordinance will be in its application in particular cases. *Troy Hills Village v. Township Council of Parsippany-Troy Hills, supra,* 68 *N.J.* at 621. The ultimate question will always remain whether the ordinance, as applied, has a confiscatory effect upon the property.

Although the financial conditions that prompted the rapid growth of rent control in New Jersey are no longer present, such as the double-digit inflation and oil crises of the 1970's, it appears likely that despite a leveling of inflation and the noninflationary trend of the present economy, rent control will remain a fixture in many New Jersey communities. Rent control is no longer predicated upon a housing emergency. *See Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 594 (1975). It may be regarded as a form of governmental regulation in the public interest. *Helmsley v. Borough of Fort Lee, supra,* 78 *N.J.* at 243. Significant changes have been made in the economic relationship between landlord and tenant. *See, e.g., N.J.S.A.* 2A:18–61.1 to –61.21 (Anti-Eviction Act); *N.J.S.A.*

---

before the board or administrator serves as the basis for constitutional review by the appellate courts. *Zussman v. Rent Control Bd. of Brookline,* 371 *Mass.* 632, 638, 359 *N.E.*2d 29, 32 (1976); *Niles v. Boston Rent Control Adm'r,* 6 *Mass.App.Ct.* 135, 137–144, 374 *N.E.*2d 296, 299–301 (1978).

2A:18–61.22 to –61.39 (Senior Citizens and Disabled Protected Tenancy Act); *N.J.S.A.* 2A:18–61.1(f) (unconscionability of rent increase is a defense to removal for cause based upon failure to pay rent); *see also* New Jersey Institute for Continuing Legal Education, *Tenant-Landlord Practice* 53 (1983) ("Virtually all rent control ordinances provide that tenants may apply for reduced rents for failure to provide the same standards of service and maintenance which the landlord provided or was required to provide by law or lease").

Nonetheless, new patterns of development in New Jersey have unleashed powerful market forces that have continued to create instability in the rental housing market. Particularly in the fast-growing areas along the Hudson River, so much advantage exists in the new commercial or condominium markets that owners are forcing out existing tenants. Winerip, *For Jersey Tenants, Hard Lessons in Real Estate,* N.Y. Times, April 1, 1986, at B2, col. 1. These speculative forces threaten the ability of a community to maintain a sound housing balance for its citizens.

It appears likely then that judicial challenges to rent control decisions will continue. The trial court in the Weehawken case remarked that "[w]ith no formula or set of absolutes for trial courts to apply, we are left only with a vague sense of what the outer limits of unfairness are for purposes of constitutional tests." Future litigation might focus more concretely upon additional evidence that will better enable reviewing courts to determine whether a fair return has been achieved.

An aid to a reviewing court would be a record of whether the property's net operating income has been steadily diminishing. This measure is reflected in many rent control ordinances and is in part the theme of *Helmsley v. Borough of Fort Lee, supra.* In *Helmsley,* the Court considered the effect of the Fort Lee ordinance against a background of increasing operating expenses and predicted in the operation of the ordinance a continuing diminution in net operating income. 78 *N.J.* at 220–22.

In considering the effect of limiting rent increases to 2.5 percent the Court found that "five years of 6% operating expense increases and 2.5% rent increases would produce a 5.4% decrease in [net operating income]. After deducting debt service, however, the landlord's cash flow would decrease approximately 20%." *Id.* at 221. In *Helmsley,* the Court projected the diminishing income on the basis of the anticipated effect of the ordinance over a period of years and found the ordinance facially invalid when the projected effect was combined with an inadequate hardship-relief mechanism. *Id.* at 233.

Kenneth Baar and Dennis Keating recommend a maintenance-of-net-operating-income (cost-passthrough) fair return standard. Baar & Keating, *Controlling Rent Control,* 11 *N.J. Reporter* 19, 24 (Oct.1981).

> This type of standard has been used since the early 1970's in Massachusetts, where it has led to generally satisfactory results and has withstood legal challenges. Under this standard, a landlord is entitled to a hardship increase if operating expense increases after a designated date have exceeded increases in rental income. In effect, the standard preserves a landlord's net operating income, rather than designating a particular rate of return on equity or value as fair for all landlords. [*Id.*]

Stated in a formula, it is that

> gross rent = base period rent + (current operating expenses—base period operating expenses).

Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade, supra,* 35 *Rutgers L.Rev.* at 809. The measure should be kept simple. For purposes of using this analysis, a court need not now require that the operating income be adjusted for inflation. *See, e.g., id.* at 843 (annual general adjustment standards "that tie annual increases to overall inflation rates may allow for increases which are more or less than adequate to cover operating cost increases"). The analysis was suggested in *Helmsley,* where the Court noted that "long-term stagnation of profits might [itself] be proved to be confiscatory[,]" although the issue was not before it. 78 *N.J.* at 218, 223. It would be a rough measure of the ordinance's effectiveness. We do not perceive in New Jersey's rent control

schemes a plan to diminish property value; nor do any of the commentators. *See, e.g.,* Note, *Rethinking Rent Control: An Analysis of "Fair Return"*, 12 *Rutgers L.J.* 617, 625, 625–26 n.76 (1981) ("policy underlying New Jersey's moderate rent control may be identified as that of stabilizing rents while avoiding the harsh consequences of strict rent control, such as * * * decline in property value").[10]

In *Fisher v. City of Berkeley, supra,* the California Supreme Court noted that a rent control ordinance cannot indefinitely freeze rent ceilings. 37 *Cal.*3d at 683, 693 *P.*2d at 292, 209 *Cal.Rptr.* at 713. The opposite seems necessarily true, that an ordinance cannot indefinitely reduce operating profit without eventually causing confiscatory results. This is the theme of *Helmsley,* discussed in terms of operating ratios, *Helmsley v. Borough of Fort Lee, supra,* 78 *N.J.* at 217–20, as well as in the context of diminishing net operating income, *id.* at 223 ("[a]t some point, steady erosion of [net operating income] becomes confiscatory") (footnote omitted). But ratios are all subject to divergence. *See* Baar, *Guidelines For Drafting Rent Control*

---

[10]Although "confiscatory" has been defined in terms of "the lowest constitutionally permissible rate," *Troy Hills Village v. Township Council of Parsippany-Troy Hills,* 68 *N.J.* 604, 622 (1975), it has also been defined as the "antonym" of "just and reasonable." *Hutton Park Gardens v. Town Council of West Orange,* 68 *N.J.* 543, 569 (1975). The rate of return

> must be high enough to encourage good management including adequate maintenance of services, to furnish a reward for efficiency, to discourage the flight of capital from the rental housing market, and to enable operators to maintain and support their credit. * * * On the other hand [a just and reasonable return] is also one which is not so high as to defeat the purposes of rent control nor permit landlords to demand of tenants more than the fair value of the property and services which are provided. [*Troy Hills Village v. Township Council of Parsippany-Troy Hills, supra,* 68 *N.J.* at 629.]

For the most part, New Jersey's rent control ordinances have been second-generation ordinances that allow a reasonable passthrough of operating expenses. Note, *Rethinking Rent Control: An Analysis of "Fair Return"*, 12 *Rutgers L.J.* 617, 624–25 (1981). They are designed to prevent overcharging or gouging. *Id.* They must be presumed to be directed at the maintenance of rental housing as a vital segment of a free market housing economy.

*Laws: Lessons of a Decade, supra,* 35 *Rutgers L.Rev.* at 805 (study of operating-cost-to-gross-rental-income ratios of Washington, D.C., apartments revealed average ratios ranging from .53 to .81); Baar & Keating, *Controlling Rent Control, supra,* 11 *N.J. Reporter* at 23 ("[i]n a community where buildings are assessed at 70 percent of value on the average, some buildings will be assessed at less than 50 percent, others at more than 90 percent of value"). Using reduction of net operating income will be a useful tool in applying this analysis.

Although there is a difference between operating ratio and maintenance of net operating income, the latter method is less susceptible of manipulation and easier for reviewing courts to employ. It necessarily presupposes that a landlord will maintain and submit to rent leveling boards levels of operating expenses. Of course there will be dispute about whether a chosen base-period rent is a fair rent.

In the Weehawken case, the trial court believed that if an income-based standard had been used in the ordinance, plaintiffs would have been entitled to some relief. By allowing courts to evaluate fair return in this light, we believe that the purposes of rent control in New Jersey will be furthered. If it is thus shown that an ordinance is defeating the purpose of rent control by steadily diminishing income and causing the flight of rental housing from the market, relief would be warranted.[11]

---

[11]As economic conditions change in New Jersey, perhaps some consideration may be given in an appropriate case to whether the rental income allowed under the ordinance is commensurate with a fair return on the assessed value of the property. We realize that in *Helmsley v. Borough of Fort Lee,* this Court rejected a value-based return. 78 *N.J.* 200, 215 (1978), *appeal dismissed,* 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979). Nonetheless, there is a constitutional imperative that all real property be assessed "according to the same standard of value," *N.J. Const. of 1947* art. VIII, sec. 1, para. 1; that imperative has been effectuated by the legislative criterion of assessment at "true value," *N.J.S.A.* 54:4-2.25.

In the years since the development of rent control, it has frequently been necessary to evaluate property in New Jersey in light of or even despite rent

However, because of the manner in which the Weehawken case was tried and has evolved, we do not find a remand to be in order.

## V.

We offer these suggestions not in the belief that they will resolve all the complexities of rent control litigation but in the belief that they will help trial courts and parties in addressing the issues involved. So much has happened since the reappearance of rent control in New Jersey that we believe progress can be made in this sensitive area of municipal economic regulation. The rental shocks of the 1970s have been eased by the abatement of double-digit inflation, high interest rates, and oil embargoes; for how long we do not know. Tenants' and owners' interests may now be better able to coalesce in the maintenance of a viable rental housing market.

As noted, in the cases before us the records do not establish that the ordinances have had a confiscatory effect. The judgments of the Appellate Division are affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For reversal*—None.

---

control ordinances. Courts have striven to ascertain true value. In cases where there is potential for condominium conversion, assessments are beginning to reflect the values that encourage people to remain investors in real estate. *See, e.g., Americana Assocs. v. Borough of Fort Lee,* 202 *N.J.Super.* 92, 96 (App.Div.), *certif. denied,* 102 *N.J.* 304 (1985) ("fact that property may, as an abstract proposition, have potential conversion value may not be treated as an increment to value unless shown by quantifying evidence to be of meaningful substance").

We realize that there are complexities to this suggestion, not the least of which will be consideration of tax-passthrough features of the ordinance and the appropriate application of the Director's Ratio (*L.* 1973, *c.* 123, § 2, *repealed by L.* 1983, *c.* 45, § 54:51A–21 (current version at *N.J.S.A.* 54:51A–6)) to the assessed value, that may invite the same "circular process" disapproved by *Helmsley v. Borough of Fort Lee, supra,* 78 *N.J.* at 214. Still, that circularity might be avoided by a properly tailored and limited inquiry as to the relationship of the return to assessed value.