277 N.J. Super. 524 (1994)
649 A.2d 1342
BARRY SILVERMAN, LYNN SILVERMAN, CARL P. GROSS AND HENRY H. BLOOM, T/A SILVERMAN CHATEAU 21, A PARTNERSHIP, PLAINTIFFS-APPELLANTS,
v.
RENT LEVELING BOARD OF CLIFFSIDE PARK; MAYOR AND COUNCIL OF CLIFFSIDE PARK, DEFENDANTS-RESPONDENTS, AND GEORGE AHRENS, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1994.
Decided December 6, 1994.
*527 Before Judges GAULKIN, BAIME and KESTIN.
Christopher J. Hanlon argued the cause for appellants (Gross, Hanlon, Truss & Messer, attorneys).
William C. Rindone argued the cause for respondents (Liebowitz & Liebowitz, attorneys).
The opinion of the court was delivered by BAIME, J.A.D.
This is an appeal from a judgment sustaining the denial of plaintiffs' application for a hardship rent increase by the Mayor and Council of Cliffside Park. Plaintiffs also appeal from the dismissal of their action for inverse condemnation and for damages under 42 U.S.C. § 1983. During the pendency of these proceedings, the tenant vacated the subject apartment which was then rented at market value as authorized by the vacancy decontrol provision of the rent control ordinance. Plaintiffs have disavowed *528 any intent to sue the tenant for the difference between the rent charged and the amount sought in their hardship application. We thus dismiss as moot plaintiffs' appeal from the denial of their request for a hardship rent increase. We affirm the Law Division's dismissal of plaintiffs' claims for inverse condemnation and for damages under the federal Civil Rights Act.

I.
This appeal has a tortured history. On June 15, 1980, George Ahrens entered a month-to-month lease for a one bedroom apartment at "the Chateau" in Cliffside Park. The monthly rent was $370 including electricity. On December 8, 1980, the owner began converting the building into condominiums. On July 27, 1981, the Senior Citizens and Disabled Protected Tenancy Act (N.J.S.A. 2A:18-61.22 to -61.39) became effective. Under the Act, Ahrens could not be evicted for a 40 year period following the conversion. See N.J.S.A. 2A:18-61.23; N.J.S.A. 2A:18-61.24h. However, the Act authorizes the owner to effect reasonable rent increases during this period, as long as such increases are not attributable to the cost of conversion. N.J.S.A. 2A:18-61.31.
On August 25, 1981, plaintiffs entered into a contract with the building owner to purchase the unit occupied by Ahrens. In September 1981, the Cliffside Park rent control ordinance was amended to include condominiums. Ahrens' unit was conveyed to plaintiffs for $52,500 by deed dated November 6, 1981, approximately one month after the effective date of the amendment to the rent control ordinance. Plaintiffs believed, however, that their newly purchased unit was not covered by the amendment because the purchase contract antedated the amendment's effective date.
Plaintiffs sought to increase Ahrens' rent to $470, effective February 1, 1982. After serving a notice to quit, plaintiffs instituted a summary eviction action in the Bergen County District Court. The District Court dismissed plaintiffs' complaint on the ground that Ahrens' rent was controlled by the Cliffside Park *529 ordinance. On June 21, 1983, we affirmed in an unreported opinion.
During the pendency of their appeal to this court, plaintiffs filed a hardship application with the Cliffside Park Rent Leveling Board, requesting an increase of $1,166 per month. Under the Cliffside Park ordinance, the Board "may grant the landlord a hardship rent increase if it is satisfied that such hardship does in fact exist...." Cliffside Park, N.J., Rev.Ord.Supp. § 11-2.11 (1980). The ordinance does not specify a method for calculating "hardship" nor does it set forth criteria, standards, or guidelines in that respect. At the time of plaintiffs' application, the rent control ordinance also authorized an automatic seven percent increase at the expiration or termination of a tenancy. In the case of a month-to-month lease, municipal authorities construed the ordinance as authorizing an annual seven percent increase in rent. Plaintiffs, however, never sought an increase under this provision.
We need not describe in detail the extensive materials presented to the Board in support of plaintiffs' hardship application. Plaintiffs employed both the "return on fair value" and "return on investment" approaches described by our Supreme Court in Troy Hills Village v. Parsippany-Troy Hills Tp. Council, 68 N.J. 604, 350 A.2d 34 (1975); but see Helmsley v. Borough of Fort Lee, 78 N.J. 200, 215, 394 A.2d 65 (1978). Plaintiffs claimed that the $52,500 purchase price was an "insider price" and that the condominium was worth $65,000  a value they arrived at by utilizing comparable sales for two similar apartments in the same building. Although the rent for the comparable units was "in the $750's" for one and "in the high $600's" for the other, plaintiffs asserted they were entitled to a 16% rate of return, which, coupled with reasonable expenses, yielded a total of $17,359.25 to be amortized over a 12 month period. Applying the fair value approach, plaintiffs suggested a monthly rental of $1,446. Plaintiffs also presented expert testimony respecting the return on investment approach. Of the $52,500 purchase price, plaintiffs borrowed $47,300 at an interest rate of 14.5 percent. By adding various expenses and *530 costs, plaintiffs' total investment in "current dollars" was said to be $24,195. Applying a sixteen percent rate of return on investment yielded $3,871, to which operating expenses and investment payments on the mortgage were added. Amortizing the total amount, $17,089, over a 12 month period, the expert testified that $1,422 would be a reasonable rent and would produce a reasonable rate of return on investment.
The Board denied plaintiffs' application, noting only that the amount of the increase sought by plaintiffs was "unconscionable." Plaintiffs' appeal to the Mayor and Council was equally unavailing. The increase requested was denied without comment.
Plaintiffs then filed an action in lieu of prerogative writs, naming as defendants the Board, the Mayor and Council, and Ahrens. Ahrens filed a counterclaim in which he requested protected tenancy status. The Law Division upheld the determination of the Mayor and Council, but granted protected tenancy status to Ahrens.
In an unreported opinion, we upheld the Law Division's decision that Ahrens qualified for protected tenancy status. However, we reversed that part of the judgment that sustained the denial of plaintiffs' application for a hardship rent increase. We held that both the Rent Leveling Board and the Mayor and Council had failed to articulate the factual and legal bases upon which their decisions rested. We also said that the municipal agencies had erroneously adopted an "all or nothing" approach in considering plaintiffs' application and that it was incumbent upon the municipal agencies to carefully scrutinize the financial data submitted and, if required, grant whatever increase they deemed appropriate.
On remand and after additional hearings, the Rent Leveling Board again made no specific findings regarding what rental amount would yield the lowest reasonable rate of return. The gist of its decision was that plaintiffs had made a poor investment decision in buying the unit and that Ahrens was under no duty to make up for the owners' shortfall. The Board also expressed *531 some doubt about the hardship claim in light of the fact that plaintiffs had never availed themselves of the provision in the rent leveling ordinance allowing a seven percent increase at the conclusion of a lease. The Board ultimately granted a seven percent rent increase retroactive to the date of plaintiffs' application. However, the Mayor and Council subsequently reversed the Board's determination and denied plaintiffs any rent increase.
Plaintiffs thereafter filed a second action in lieu of prerogative writs, contending that the municipal agencies' actions were arbitrary and capricious and ran afoul of our remand order. Plaintiffs also claimed that the rent control ordinance had been applied in a confiscatory manner resulting in a "partial taking" by inverse condemnation. Finally, plaintiffs sought damages and attorneys fees under 42 U.S.C. § 1983. The Law Division judge agreed that the resolutions adopted by the Board and the Mayor and Council were bereft of factual findings and legal conclusions. Nonetheless, the Law Division judge reviewed the record and determined that plaintiffs had failed to sustain their burden of proof.
We then reversed the Law Division's judgment, finding that both municipal agencies had failed to comply with our prior opinion and that the judge's factual determinations were not supported by the record. We declined to address plaintiffs' claims for inverse condemnation and damages under the Civil Rights Act, finding them premature. We also rejected plaintiffs' request that we exercise original jurisdiction under R. 2:10-5. Instead, we concluded that the interests of justice would best be served by returning the matter to the Rent Leveling Board, the administrative agency charged with deciding whether the rent then in effect yielded a reasonable rate of return. We again remanded the matter to the Board and directed it to make appropriate findings and conclusions within ninety days of our March 21, 1990 opinion.
In June 1990, the Board reconvened with an entirely new membership. Plaintiffs were granted permission to supplement their application with additional documentary submissions. Following extensive hearings, the Board adopted a resolution granting *532 a hardship increase, finding that a monthly rent of $866 would yield the lowest reasonable rate of return. The Board directed that the rent increase be made retroactive to the date of plaintiffs' original application.
The record does not fully disclose what followed. It appears that Ahrens vacated the premises during or shortly after the hearing before the Board. At that point the apartment was rented at a rate set by plaintiffs under the vacancy decontrol provision contained in the rent control ordinance. Cliffside Park, N.J., Rev.Ord.Supp. § 11-2.11d. However, apparently fearful that he would be sued for back rent, Ahrens appealed the Board's determination to the Mayor and Council, which appointed a former Superior Court judge to serve as hearing officer.
We have no occasion to recount at length the hearing officer's extensive findings. The key findings were that plaintiffs had purchased the condominium unit at a below market price, that they had never availed themselves of the automatic seven percent rent increase provision, and that they were not entitled to a hardship rent increase. The Mayor and Council adopted the hearing officer's report and denied plaintiffs' application. This appeal followed.

II.
Initially, we see no reason to decide whether the Mayor and Council acted in an arbitrary and capricious manner in reversing the Board and denying plaintiffs' application for a hardship rent increase. As already noted, Ahrens vacated the apartment either during or after the the Board's latest proceeding, and plaintiffs were then able to charge any rent they desired. Although the Board has historically made hardship rent increases retroactive to the date of the landlord's application, see Orange Taxpayers Council, Inc. v. Orange, 83 N.J. 246, 259, 416 A.2d 353 (1980), plaintiffs have unequivocally disavowed any intent to sue Ahrens for the difference between the rent charged and the amount necessary to yield the lowest reasonable rate of return. *533 Thus, any opinion rendered by us on the subject can have no practical effect upon the rights and duties of the litigants. We therefore deem the issue moot. Application of Madin/Lord Land Dev. Intern., 103 N.J. 689, 695, 512 A.2d 490 (1986).

III.
While we have no occasion to decide the question, we assume that plaintiffs should have been permitted to charge Ahrens a monthly rent of $866 retroactive to the date of plaintiffs' application. We now consider whether Cliffside Park's failure to allow plaintiffs a reasonable return on their property constituted a partial and temporary taking without just compensation.
In Inganamort v. Borough of Fort Lee, 62 N.J. 521, 303 A.2d 298 (1973), our Supreme Court sustained a municipality's power to adopt rent control ordinances. Nevertheless, property owners are entitled to a "just and reasonable" return on their investments  a phrase not susceptible to precise definition. In order to pass constitutional muster, "not only must a rent control ordinance be facially nonconfiscatory, ... but it must also be nonconfiscatory as applied." Brunetti v. Borough of New Milford, 68 N.J. 576, 595, 350 A.2d 19 (1975). Landlords cannot be forced to subsidize their tenants' housing needs. Troy Hills Village v. Parsippany-Troy Hills Tp. Council, 68 N.J. at 620, 350 A.2d 34. Ordinarily, price controls are considered confiscatory if they prevent an economically efficient landlord from receiving a "just and reasonable" return on his investment. Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 568, 350 A.2d 1 (1975).
Our Supreme Court has said that "where a rent control scheme will have a foreseeable, widespread confiscatory impact, it is constitutionally necessary to provide a mechanism `capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary.'" Helmsley v. Borough of Fort Lee, 78 N.J. at 226, 394 A.2d 65 (quoting Birkenfeld v. City of Berkeley, 17 Cal.3d 129, 169, 130 *534 Cal. Rptr. 465, 494, 550 P.2d 1001, 1030 (1976)). While recognizing that "[s]ome short-term uncompensated confiscation may well be unavoidable under rent control," the Court determined that "it is essential that the severity and duration of such takings be minimized." Id. at 226, 394 A.2d 65. Although some regulatory lag is to be expected, at some point the delay may be of such duration and its effect so onerous as to constitute a taking. Id. at 230, 394 A.2d 65.
Under both the federal and State constitutions, "government cannot take private property without paying just compensation." Bernardsville Quarry v. Bernardsville Borough, 129 N.J. 221, 231, 608 A.2d 1377 (1992). The most obvious example of a taking is when property is physically invaded. Littman v. Gimello, 115 N.J. 154, 161, 557 A.2d 314, cert. denied, 493 U.S. 934, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). "The physical occupation or appropriation of private property by government most directly and obviously implicates the [coextensive federal and State] constitutional obligation to pay just compensation[.]" Bernardsville Quarry v. Bernardsville Borough, 129 N.J. at 231, 608 A.2d 1377; see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Without question, however, "private property can be effectively taken by government through regulatory measures that do not amount to physical occupation or appropriation." Bernardsville Quarry v. Bernardsville Borough, 129 N.J. at 231, 608 A.2d 1377. Restrictions on land use that fall short of total appropriation may nonetheless constitute a taking if sufficiently extensive and prolonged. See e.g., Schiavone Const. Co. v. Hackensack, 98 N.J. 258, 263-64, 486 A.2d 330 (1985); Washington Market Enter. v. Trenton, 68 N.J. 107, 118, 343 A.2d 408 (1975).
It has been said that "[r]egulatory takings are generally too fact-sensitive to be governed by a single, all-inclusive rule," Bernardsville Quarry v. Bernardsville Borough, 129 N.J. at 232, 608 A.2d 1377, and that "there is no precise formula that courts use to determine whether a compensable `noninvasive' taking has *535 occurred." Littman v. Gimello, 115 N.J. at 162, 557 A.2d 314. The United States Supreme Court has eschewed any set takings formula, and has relied instead on "ad hoc, factual inquiries into the circumstances of each particular case...." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166, 178-79 (1986). It has identified three factors said to have "particular significance." Ibid. These include (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. Ibid.; see also Bernardsville Quarry v. Bernardsville Borough, 129 N.J. at 233, 608 A.2d 1377; Gardner v. New Jersey Pinelands Com'n., 125 N.J. 193, 205, 593 A.2d 251 (1991). In terms of "regulatory lag," Helmsley v. Borough of Fort Lee, 78 N.J. at 229, 394 A.2d 65, we have taken a similar approach. In Rieder v. State Dept. of Transp., 221 N.J. Super. 547, 535 A.2d 512 (App.Div. 1987), we identified three factors bearing upon whether administrative delay in the context of land use control constitutes a taking. Id. at 554, 535 A.2d 512. They are "(1) the intensity of governmental regulation, (citations omitted) (2) the nature and extent of impairment upon the landowner's beneficial use of the property, (citations omitted) and (3) the time period within which the owner is so deprived (citations omitted)." Ibid.; see also Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 237 A.2d 881 (1968).
We do not doubt that "[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them...." Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 591, 46 S.Ct. 408, 410, 70 L.Ed. 747, 749 (1926). However, "decreases in the value of property during governmental deliberations, absent extraordinary delay, are incidents of ownership and do not constitute a taking." Littman v. Gimello, 115 N.J. at 163, 557 A.2d 314. "`[I]n the absence of an interference with a owner's legal rights to dispose of his land even a substantial reduction in the attractiveness of the property to potential purchasers does not entitle [him] to compensation *536 under the Fifth amendment.'" Ibid. (quoting Kirby Forest Indus. v. United States, 467 U.S. 1, 15, 104 S.Ct. 2187, 2197, 81 L.Ed.2d 1, 14 (1984)); see also Agins v. Tiburon, 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106, 113 n. 9 (1980); Danforth v. United States, 308 U.S. 271, 284-85, 60 S.Ct. 231, 236, 84 L.Ed. 240, 246 (1939); Lyons v. City of Camden, 52 N.J. 89, 99, 243 A.2d 817 (1968).
Although a municipal rent control ordinance, as applied, must permit an efficient landlord to realize a "`just and reasonable return' on [the] property," Helmsley v. Borough of Fort Lee, 78 N.J. at 210, 394 A.2d 65, "[d]eciding what is a `just and reasonable return' in a given case can be very difficult." Mayes v. Jackson Tp. Rent Leveling Bd., 103 N.J. 362, 367, 511 A.2d 589 (1986), cert. denied, 479 U.S. 1090, 107 S.Ct. 1300, 94 L.Ed.2d 155 (1987). The checkered history of our judicial decisions and the uneven treatment given to various formulas disclose the complexity of these problems. Compare Helmsley v. Borough of Fort Lee, 78 N.J. at 215, 394 A.2d 65 (rejecting value-based return), with Mayes v. Jackson Tp. Rent Leveling Bd., 103 N.J. at 381 n. 11, 511 A.2d 589 (suggesting fair return on assessed value). Wholly apart from the formulas used, there is substantial disagreement concerning whether real estate investors may reasonably "expect the same return as those in fixed-face amount investments such as certificates of deposit or treasury bills," a question hotly debated in this case. See Mayes v. Jackson Tp. Rent Leveling Bd., 103 N.J. at 372, 511 A.2d 589. We are sensitive to the fact that many municipalities lack funds for technical staffs, relying instead upon unpaid volunteer rent leveling boards. Helmsley v. Borough of Fort Lee, 78 N.J. at 233-34, 394 A.2d 65. Our Supreme Court has said that "[p]resently the local boards do not have sufficient expertise to understand the complexities of rent regulation and real estate finance." Id. at 233 n. 20, 394 A.2d 65 (quoting Baar, Rent Control in the 1970's: The Case of the New Jersey Tenants' Movement, 28 Hastings L.J. 631 (1977)). The Court has also acknowledged that judicial review designed to provide an adequate remedy for isolated instances of insufficient administrative relief is *537 a daunting task. Mayes v. Jackson Township Rent Leveling Bd., 103 N.J. at 376, 511 A.2d 589.
These problems cannot excuse administrative incompetence that substantially impairs a landlord's rights. However, the complexity of the subject indicates that mistakes are inevitable and that public entities, and ultimately their taxpayers, cannot always be called to account when errors are made. Considering these circumstances, we conclude that in order to recover damages on an inverse condemnation claim, the municipal agency's decision and the administrative lag in according a remedy must have substantially destroyed the landlord's beneficial use of his property.
While we do not endorse the desultory pace at which plaintiffs' application was reviewed by the municipal agencies, we reject the claim that there was a taking without just compensation. On two occasions, the Board imperfectly exercised its powers. However, the decisions reached by the Law Division were also imperfect. We recognize that we too "have no monopoly on justice." Rather, we share it with many, including administrators, whose task may be as difficult as ours. Dougherty v. Human Services Dep't., 91 N.J. 1, 10, 449 A.2d 1235 (1982). We do not doubt that plaintiffs suffered a monetary loss because of the extrinsic fact that the tenant vacated the premises before this litigation concluded. Nevertheless, we perceive no sound basis for requiring Cliffside Park to answer in damages on that account.

IV.
What we have said applies with equal force to plaintiffs' claim for damages under the Federal Civil Rights Act. In our two prior opinions, we found that the Board was arbitrary and capricious when it denied plaintiffs' application for a hardship increase without articulating its reasons. However, those findings do not require that Cliffside Park respond in damages under 42 U.S.C. § 1983. "[W]hile the words `arbitrary and capricious' may sound harsh, they are simply the standard of appellate review in particular *538 cases." Anastasio v. Planning Bd. of Tp. of West Orange, 209 N.J. Super. 499, 522, 507 A.2d 1194 (App.Div.), certif. denied, 107 N.J. 46, 526 A.2d 136 (1986). If we were to hold a municipal agency liable under 42 U.S.C. § 1983 merely for mistakenly exercising power under state law remediable under state law, public entities on all levels would face a myriad of potential claims and would serve at great financial peril. Ibid.; see also Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986); Monell v. Dep't of Social Serv., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611, 635 (1978); Amsden v. Moran, 904 F.2d 748, 754 (1st Cir.1990), cert. denied, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). We do not believe that Congress intended such broad liability for ordinary governmental decisions.
To summarize, plaintiffs' appeal from the denial of their application for a hardship rent increase is dismissed as moot. The judgment dismissing plaintiffs' claim for inverse condemnation and for damages under 42 U.S.C. § 1983 is affirmed.